623 So.2d 258 (1993)
James Norwood PRATT
v.
Charlot Saunders PRATT.
No. 92-CA-0079.
Supreme Court of Mississippi.
August 12, 1993.
*259 Arnold F. Gwin, Greenwood, for appellant.
Richard C. Williams, Jr., James E. Upshaw, F. Ewin Henson, III, Upshaw Williams Biggers Page & Kruger, Greenwood, for appellee.
Before DAN M. LEE, P.J., and PITTMAN and ROBERTS, JJ.
DAN M. LEE, Presiding Justice, for the Court:

I.
Today's appeal is from the Chancery Court of Leflore County, Mississippi, where a divorce on grounds of adultery was granted to Charlotte Saunders Pratt (Mrs. Pratt) against James Norwood Pratt (Mr. Pratt) on October 18, 1991, and Mr. Pratt was denied alimony by a special judge on January 7, 1992. Mr. Pratt contends that the chancellor abused his discretion in refusing to award him any alimony whatsoever. For the reasons presented, infra, we affirm.

II.
Mr. Pratt spent the early years of his life in Winston Salem, North Carolina, where he graduated from high school. Upon graduation, Mr. Pratt left North Carolina to attend Heidelberg University for several months. However, he soon returned to his native state to attend the University of North Carolina at Chapel Hill. After attending four years at the University of North Carolina, but without obtaining a degree, Mr. Pratt moved to San Francisco. During his years in San Francisco, Mr. Pratt displayed his many talents by working at several jobs, including stints at an art gallery, as a longshoreman, as a cab driver, and during the years 1966 to 1968, as a chemist, manufacturing and selling illegal drugs.
*260 In the early 1970's, Mr. Pratt, along with several other people, started a restaurant newsletter. From this venture, Mr. Pratt gained the expertise which he later used to publish a book on wine, and later a book on tea. The wine book earned him approximately $20,000.00 in its first year of publication. Mr. Pratt earned royalties from these books up until approximately 1982. In addition to his writing, Mr. Pratt earned approximately $1,000.00 per month writing and working on a movie project for a period of four to five years in the late 1970's and early 1980's.
Mr. Pratt first met Mrs. Pratt while she was on a visit to San Francisco in 1978. The couple began a relationship and shortly thereafter, Mrs. Pratt moved to San Francisco permanently in order to be with Mr. Pratt. The ill-fated couple married less than a year later in May 1979.
The Pratts lived together in San Francisco until their first son was born in 1982, whereupon they moved to Mrs. Pratt's hometown of Greenwood, Mississippi. Mrs. Pratt had wanted to move back to Greenwood, Mississippi, where she would have help with the young child. In early 1984, Mrs. Pratt filed for divorce on the ground of cruel and inhuman treatment. In order to save the marriage, Mr. Pratt joined Alcoholics Anonymous and allegedly quit alcohol and drugs. As a result, the parties reconciled in July 1984, and lived in Greenwood, Mississippi, until the time of their final separation in September 1989.
During the five year period of time between 1984 and 1989 that the parties lived in Greenwood, the only income received by Mr. Pratt were the small royalties from his books and a $10,000.00 gift each year from Mrs. Pratt's grandmother. Although he did not work, Mr. Pratt did have some activities, such as overseeing the renovation of a home the parties had purchased for $219,000.00. Mr. Pratt also took a very active role in raising the children, the second child having been born in 1986. Testimony revealed that Mr. Pratt and Mrs. Pratt had not had sexual relations since 1986 when their second son was conceived. However, Mr. Pratt admitted that during the couple's first separation in 1984, he had begun an affair with a woman in San Francisco. Although he admitted that he had had sexual relations with this woman several times since 1984, Mr. Pratt stated that he had broken off the affair when Mrs. Pratt filed for divorce in September 1989, and that he had had no sexual relations with anyone since that time.

III.
On September 19, 1989, Mrs. Pratt filed a complaint for divorce in the Chancery Court of Leflore County against Mr. Pratt. Mrs. Pratt sought a divorce from Mr. Pratt on the grounds of adultery, habitual drunkenness, habitual and excessive use of drugs, and habitual cruel and inhuman treatment. In the alternative, she sought a divorce on the grounds of irreconcilable differences. Mrs. Pratt also sought custody of the children and child support.
Mr. Pratt answered the complaint with a general denial of its allegations and filed a counterclaim, seeking custody of the children and separate maintenance. This counter-claim was later amended to seek a divorce from Mrs. Pratt on the grounds of habitual cruel and inhuman treatment as well as alimony.
An agreement was reached whereby Mr. Pratt received temporary alimony, use of the property of the couple, and limited child custody and visitation rights. This agreement remained in effect, with only minor changes, until judgment was entered on behalf of Mrs. Pratt on October 18, 1991. Under the terms of the judgment, Mrs. Pratt was granted a divorce on the grounds of adultery. Mrs. Pratt was granted custody of the children with Mr. Pratt given specific visitation periods. Mrs. Pratt was ordered to pay unto Mr. Pratt $137,500.00, which represented the value of Mr. Pratt's one-half interest in the family home. She was also ordered to pay to Mr. Pratt's psychiatric experts a total of $77,000.00.
Mr. Pratt was not required to pay child support as he had no gainful employment and Mrs. Pratt's resources were adequate to provide for the care of the children. The trial court also ordered Mrs. Pratt to pay for *261 the litigation expenses incurred by Mr. Pratt. However, the chancellor did relieve Mrs. Pratt of any further obligation as to Mr. Pratt's expenses in connection with the balance of the litigation. Finally, the chancellor retained two issues for determination at a trial set for January 6, 1992  Mr. Pratt's claim for alimony and for an equitable property division.
At the January 6, 1992, trial, Mr. Pratt testified that at the time he married Mrs. Pratt all he had were some books, paintings, and a 1966 Mustang automobile, and that the value of these items was approximately $2,000.00 plus the value of the car (which was 13 years old at the time of the marriage). He stated that at the time of their separation, the value of these items which belonged to him solely (excluding his one half interest in the residence, and claim for a portion of the furniture and furnishings of the marital home) was approximately $2,000.00. He stated that he had the same books, paintings, and the same 1966 Mustang.
Mr. Pratt was still unemployed at the time of the trial, and he testified that he only had $90,000.00 left out of the $137,500.00 he received for his interest in the house. He stated that he planned to continue to live in San Francisco and that he planned to revise his tea book and attempt to find a source of income in the writing field. He stated that his income for the next five years would be problematic, that he didn't think he would have any income during the year 1992, but that he might make as much as $13-15,000.00 in 1993 from the revision of his tea book. As to future years, Mr. Pratt stated that he anticipated earnings far below what he required.
Upon the close of testimony by Mr. Pratt, the chancellor granted Mrs. Pratt's Rule 41(b), Miss.R.Civ.P., motion to dismiss Mr. Pratt's claim for alimony. However, the chancellor heard Mr. Pratt's claim for an equitable distribution of the personal property of the marriage. On January 7, 1992, the chancellor entered his judgment denying Mr. Pratt any alimony, and ordered a division of the personal property in question. The value of the personal property granted to Mr. Pratt was in excess of $66,000.00. Mr. Pratt appeals, claiming (as his sole grounds) that the chancellor's judgment denying his claim for alimony was an abuse of discretion.

IV.
Due to the unique circumstances presented in this case, our beginning point is the United State Supreme Court's decision in Orr v. Orr, 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979). In that case, the Supreme Court struck down an Alabama statute which created a right of alimony in women only. The Court held that such a statutory scheme violated a man's right to equal protection of the law under the Fourteenth Amendment of the United States Constitution.
In response to this decision, the Mississippi statute regarding alimony was amended effective July 1, 1985, to read in relevant part as follows:
When a divorce shall be decreed from the bonds of matrimony, the court may, in its discretion, having regard to the circumstances of the parties and the nature of the case, as may seem equitable and just, make all orders ... touching the maintenance of the wife or the husband, or any allowance to be made to her or him, and shall, if need be, require bond, sureties or other guarantee for the payment of the sum so allowed.
Miss. Code Ann. § 93-5-23 (Supp. 1992) (emphasis added).
Although Miss. Code Ann. § 93-5-23 (Supp. 1992) does not preclude an award of alimony to a husband, neither does it mandate it. The decision to award alimony, whether to husband or wife, is, as always, a discretionary matter entrusted to the sound judgment of the trial judge. Smith v. Smith, 614 So.2d 394 (Miss. 1993) (whether to award alimony is largely within the discretion of the chancellor). However, in the appropriate circumstances, Miss. Code Ann. § 93-5-23 (Supp. 1992) clearly permits the trial judge to award alimony to the husband.
This preliminary point settled, we now address the merits of Mr. Pratt's appeal.
We first note that this Court has no problem with following Orr, wherein the United States Supreme Court held that there must *262 be equal application of the law as to alimony between men and women. The problem lies in applying the facts in this particular case so as to find either spouse entitled to alimony.
Mr. Pratt complains that the lower court was manifestly in error in refusing to award him alimony due to the fact that at the time of the divorce, he was 50 years old, unemployed, and was without substantial assets. This is especially true, Mr. Pratt argues, where the evidence presented revealed that Mrs. Pratt, due to her inheritance, was worth millions and had an annual income well into six figures. We reject this argument for the reason, among others, that Mr. Pratt does, in fact, have a substantial separate estate and would not be rendered destitute by a denial of alimony.
In Retzer v. Retzer, 578 So.2d 580 (Miss. 1990), the husband was awarded a divorce on the grounds of adultery. The trial court, despite the wife's fault, awarded the wife substantial lump sum and periodic alimony. This Court reversed. In holding that the wife was improperly awarded lump sum alimony, this Court provided four factors to be considered in awarding lump sum alimony where the husband was granted a divorce:
1. Substantial contribution to accumulation of total wealth of the payor either by quitting a job to become a housewife, or by assisting in the spouse's business. Tutor v. Tutor, 494 So.2d 362 (Miss. 1986); Schilling v. Schilling, 452 So.2d 834 (Miss. 1984);
2. A long marriage. Jenkins v. Jenkins, 278 So.2d 446 (Miss. 1973); Tutor and Schilling, supra;

3. Where recipient spouse has no separate income or the separate estate is meager by comparison. Jenkins, Tutor, and Schilling, supra;

4. Without the lump sum award the receiving spouse would lack any financial security. Abshire v. Abshire, 459 So.2d 802, 804 (Miss. 1984).
Retzer, 578 So.2d at 592, (citing Cheatham v. Cheatham, 537 So.2d 435, 438 (Miss. 1988)).
We held that Mrs. Retzer did not meet the first factor due to the fact that she made no substantial contribution to the total wealth of the parties. We further held:
The disparity in their ownership of the restaurants comes from Mr. Retzer as an individual starting two new McDonald's, one in Yazoo City in 1983, and the other in Greenville in 1985. He has no lump sum alimony obligation from these acquisitions during a period when she was committing adultery and living a profligate life-style. She contributed no property, income or services in the acquisition of these restaurants. To hold that she somehow had an equitable claim in the value of these restaurants would mean no principled guide whatever in awarding lump sum alimony, depending instead on the particular view of whatever chancellor heard the case. Indeed, it would make a mockery of our effort in these cases to deal fairly with both parties to a divorce.
Retzer, 578 So.2d at 592.
In holding that the chancellor also incorrectly awarded periodic alimony, this Court in Retzer, stated:
It is a general rule that alimony will not be allowed a wife when the husband is granted a divorce because of her fault. Beacham v. Beacham, 383 So.2d 146, 147 (Miss. 1980); Russell v. Russell, 241 So.2d 366, 367 (Miss. 1970).
The rule is a sound one and is based on the proposition that a husband is entitled to have his wife receive her support in his home while she is discharging the duties of a wife as imposed under the marriage contract.
Bunkley & Morse's Amis on Divorce and Separation in Mississippi, § 6.04, p. 184 (1957).
Retzer, 578 So.2d at 592-593.
We noted that "an exception to this rule has been made in cases where the marriage has been of long duration, the husband is able to pay alimony in some amount, and the wife has no means of livelihood." Id., 578 So.2d at 593; see Wires v. Wires, 297 So.2d 900, 903 (Miss. 1974); Rainey v. Rainey, 205 So.2d 514, 515 (Miss. 1967). In those cases where an exception was made, the husband not only had the ability to pay alimony but *263 also the wife was unable to make a living or support herself.
In the recent case of Hammonds v. Hammonds, 597 So.2d 653 (Miss. 1992), this Court announced 12 factors to be considered in allowing alimony as follows:
1. The income and expenses of the parties;
2. The earning capacities of the parties;
3. The needs of each party;
4. The obligations and assets of each party;
5. The length of the marriage;
6. The presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care;
7. The age of the parties;
8. The standard of living of the parties, both during the marriage and at the time of the support determination;
9. The tax consequences of the spousal support order;
10. Fault or misconduct;
11. Wasteful dissipation of assets by either party; or
12. Any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support.
In applying these factors to the case sub judice, we find:

1. The income and expenses of the parties:
The income of Mrs. Pratt is substantially more than Mr. Pratt's which was entirely due to her inheritance, with little or no contribution from Mr. Pratt. Mr. Pratt testified that he could expect to make $13-15,000 per year by 1993 and has a minimum of $90,000.00 in his separate estate.

2. The earning capacities of the parties:
Mrs. Pratt's income of approximately $600,000 annually should continue. Mr. Pratt is an able-bodied, 50-year-old man who has attended college. Further, the trial court made a finding with reference to this factor as follows:
And the better off of the two by far is Mr. Pratt. Mr. Pratt, according to his own testimony has a good education. He quit almost before he went to college  before he finished college in his senior year. He says he was an expert chemist, and he knows a lot about wine making. He knows about writing. He's had a $1,000.00 a month income from a movie production. He would be the only one qualified apparently of the two to make a living. Mrs. Pratt is still living off of her family resources.

3. The needs of each party:
Mr. Pratt has only himself to support. He has no obligation to support the two children born of this marriage, such as housing, medical insurance, clothing, etc. All the childrens' needs are provided for by Mrs. Pratt. Therefore, his needs are only to support himself and he made no effort to seek employment during the course of the marriage. Furthermore, Mr. Pratt has already received in temporary support and individual personal property over $66,000.00, plus all outstanding debts paid, cost of all litigation in this case, all experts' fees, including attorneys' fees; the combination of all of which is estimated, as of February 14, 1991, to be in excess of $720,000.00.

4. The obligations and assets of each party:
Mr. Pratt had no debts. Indeed, Mrs. Pratt agreed and the Court ordered her to pay all of the debts. Mr. Pratt's assets include at least $90,000.00 remaining from $137,500.00 paid to him by Mrs. Pratt for his one-half interest in the homestead, and personal property worth approximately $66,950.00. Therefore, his net worth would be in the neighborhood of $156,000.00, plus.

5. The length of the marriage:
The parties were married in May 1979, separated in 1983, their first divorce was filed in 1984 (reconciled and divorce dismissed) and they separated finally in September, *264 1989. Therefore, the marriage lasted approximately 10 years, including their separation. It is to be remembered that Mr. Pratt did not work and earn a separate income during this period of time.

6. The presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care:
The Chancellor found that Mrs. Pratt would be awarded the exclusive care, custody and control of the two minor children born of this marriage and Mrs. Pratt had the total responsibility to supply all of their needs; housing, food, clothing, medical, etc., for the support of the two children.

7. The age of the parties:
At the time that Mrs. Pratt filed for divorce, she was 39 years old and Mr. Pratt was 47. Both parties were relatively young and in good health.

8. The standard of living of the parties, both during the marriage and at the time of the support determination:
The special Chancellor made the following finding as to this factor:
How do we derive from the testimony and pleadings before the Court that the standard of living of Mr. Pratt  James Norwood Pratt, would ask for alimony? I frankly don't know. I can imagine that they had a pretty good standard of living. They bought and paid for a home for $219,000.00. They had some antiques that were brought over from England, and neither one of them were working. Neither one of them were very hungry, and there were assets available for the children. But the law that I read says if Mr. Pratt is entitled to alimony, it must be based on his standard of living. And I have no proof as to his standard of living, not in this record, and not in these files.

9. The tax consequences of the spousal support order:
There being no spousal support order, this factor is inapplicable.

10. Fault or misconduct:
Mr. Pratt freely admitted his adultery which continued until the filing of this divorce, but testified that after the filing of the divorce, he had had no sexual relations with his paramour or anyone else.

11. Wasteful dissipation of assets by either party:
Mr. Pratt testified he had made several trips to San Francisco from Greenwood to visit his lover and that he had taken her on several trips abroad. In addition, Mr. Pratt has caused litigation expenses in this case reaching into many hundreds of thousands of dollars.

12. Any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support:
When all of these factors are compared to those in Hammonds, it is readily seen that the Hammonds factors simply do not apply. A review of the record leads to the inevitable conclusion that most, if not all, of the equities are for the denial of spousal support and it would be a travesty of justice to allow spousal support in this particular case.

V.
In the case sub judice, the adulterous conduct of Mr. Pratt does not stand as a bar to his receiving an award of alimony. In cases where there has been a long-term marriage, where the adulterous spouse has contributed in some substantial manner to the couple's joint accumulation of wealth, and where the offending spouse has no means of livelihood, an award of alimony is proper to prevent the adulterous spouse from certain destitution. Hammonds, 597 So.2d at 654-655. As the facts reveal, these factors are simply not present in the case at bar. Certainly, Mr. Pratt was not rendered destitute by the trial judge's decision refusing to award him permanent alimony.
The record reveals that Mr. Pratt is a bright, well-educated, able-bodied 50-year-old man, quite capable of finding employment. The marriage only lasted slightly over ten years before Mrs. Pratt filed for divorce the second time. The wealth of the *265 couple was due entirely to Mrs. Pratt's inheritance. Furthermore, Mr. Pratt has no child support obligations nor was he required to pay any legal fees or court costs. In addition to receiving over $200,000.00 in cash plus half of the personal property of the parties, Mr. Pratt has published several books and admitted that he could expect to earn $13-15,000.00 annually from their revisions. In his findings, the special chancellor, noting the amounts of money paid by Mrs. Pratt to Mr. Pratt, stated:
Mr. Pratt we've worked ourselves now up to about a quarter of a million dollars in temporary alimony. You came into this marriage like a baby, and according to your testimony, with nothing but a handful of books and a car. Now, you still got the car, and you still got the books. But insofar as the alimony is concerned, I think you need to go out of this marriage like we all go out of this world with just what you came into it. You were at fault. You've already gotten a quarter of a million dollars. And the judge said that the Judgment that you signed he was going to consider that. I frankly am surprised Mrs. Pratt's attorney didn't ask for a refund, because you've gotten a quarter of a million by way of temporary alimony. And I think that's sufficient.
In light of the fact that Mr. Pratt contributed nothing to the couple's total wealth, the marriage was relatively short, Mr. Pratt has a substantial separate estate, and his financial security is not dependent on an award of alimony, there was clearly no abuse of discretion by the chancellor in refusing to award alimony to Mr. Pratt. We therefore affirm the decision of the Chancery Court of Leflore County.
THE DECREE OF THE CHANCERY COURT OF LEFLORE COUNTY DATED JANUARY 7, 1992 IS AFFIRMED.
HAWKINS, C.J., and SULLIVAN, PITTMAN, BANKS, McRAE, ROBERTS and SMITH, JJ., concur.
PRATHER, P.J., concurs in result only.