651 So.2d 513 (1995)
Teresa Gay CREEKMORE
v.
Edward Robert CREEKMORE, III.
No. 92-CA-0498.
Supreme Court of Mississippi.
February 23, 1995.
*514 Nancy Allen Wegener, Clarksdale, for appellant.
Andrew K. Howorth and Benjamin H. Sanders, Hickman Goza & Gore, Oxford, for appellee.
EN BANC.
SULLIVAN, Justice, for the Court:
This appeal arises from the Calhoun County Chancery Court's final judgment granting Teresa Gay Creekmore a divorce from Edward Robert Creekmore, III. The chancellor awarded Teresa Creekmore lump sum alimony of $12,000.00, periodic alimony of $12,000.00 to be paid in $500.00 increments for twenty four months or until Edward's death, whichever comes first, and attorney fees.
A lump sum award of $12,000, or $24,000 when both alimony awards are considered in combination, is a meager amount of lump sum alimony, given the parties' respective financial situations, and is grossly inadequate so as to reveal an abuse of discretion. This Court is also concerned that the conduct of the attorneys which resulted in punishment of the client is improper.
For these reasons, and for the chancellor to make findings of fact and conclusions of *515 law, this case is reversed and remanded for reconsideration by the chancellor.

THE FACTS
Teresa Gay Creekmore, thirty years old at the time of the divorce, is a high school graduate who attended Northwest for two years, studying child care. In April, 1984, she married Edward Robert Creekmore, III, whom she knew to use Valium, marijuana, and alcohol. Teresa thought she could change Edward because she loved him so much. On their wedding night, Teresa learned firsthand that Edward also used cocaine. The couple made their home in Calhoun City where Teresa worked as a seamstress at Calhoun Apparel (a garment factory) at the time of the marriage. Teresa continued to work there for five years after the marriage, until about a month before her baby was due, in November of 1989. Once their daughter, Gentry Shannon, was born, on December 30, 1989, Teresa and Edward mutually decided that Teresa should not go back to work, but should stay home with their child. Throughout the course of the seven year marriage, although Teresa occasionally stayed with friends or relatives for short periods of time when Edward's drug and/or alcohol problems were at their worst, Teresa remained concerned about Edward and visited him as often as allowed while he was hospitalized in one treatment center or another.
After years of substance abuse problems, attempts at treatment, broken promises, and arrests, Teresa finally had her fill and left Edward on July 4, 1991. She took Gentry Shannon and stayed with her sister and brother-in-law in Belzoni, where Teresa went to work part-time at the Factory Connection, a clothing store, for $4.25 an hour. Teresa hoped to obtain her degree in special education and enter the teaching profession, which would allow her to support herself and Gentry Shannon. With her previous two years at Northwest, Teresa believed she could obtain her degree in a little over two years if she went full-time, but because of child care requirements she would prefer to attend school part-time.
Teresa had no savings of her own when she married Edward. She attended Northwest on a school loan, which she repaid from her wages before and after her marriage to Edward. Prior to when Teresa left her job at Calhoun Apparel, she was taking home about $140.00 or $150.00 a week after deductions for taxes, social security, and health insurance. Initially she bought groceries with this money and deposited her paychecks into her and Edward's joint checking account. Later she and Edward kept their funds separately and Teresa stopped depositing her checks into the joint account. This did not prevent Edward from "borrowing" money from Teresa to support his drug addictions. Teresa never contributed any funds to Eddie's individual or trust accounts which he inherited from his family. Edward's mother paid some of the couple's bills, including groceries, property taxes, homeowners' insurance, and automobile insurance. However, the property taxes and homeowners' insurance were for houses owned jointly by Edward and his mother. Teresa said that Edward's mother never paid any of her (Teresa's) bills nor any bills on her (Teresa's) car. Edward's mother verified this testimony. For the twenty months that Teresa was a homemaker, she cooked and kept the house reasonably clean, although Edward also did some cooking.
Teresa determined that she wanted to stay in Belzoni after the divorce, rather than return to Calhoun City. She found that rent in Belzoni would run between $300.00 and $350.00 a month. The houses she had looked at were priced around $30,000.00. An estimate of monthly expenses for Teresa and Gentry Shannon was $1,600.00. Daycare for Gentry Shannon would cost about $175.00 a month in Belzoni. Teresa had no stocks, bonds, or savings accounts, and had only about $300.00-$400.00 in her checking account. Teresa drove a 1985 Chevrolet Caprice which Eddie had bought for her and which had an outstanding balance due. Regarding household furnishings and effects, Teresa wanted only her Tupperware, the dishes she brought to the marriage, the china, crystal and silver the couple had received as wedding gifts, her clothes, and Gentry Shannon's toys and clothes. Teresa was unable *516 to pay the $3,000.00 attorney fee she had accrued at the time the hearing commenced in October, 1991.
Edward Robert Creekmore, III, thirty years old at the time of the divorce, was not working when he married Teresa, but did work for a time during their marriage, for a construction company. He left after a couple of months because he did not like getting up that early and just got tired of it. A month or two before Teresa fled the marital home, Edward had started building picnic tables. This is the extent of Edward's work history during the period of time he was married to Teresa. Edward does not work because of a steel rod in his leg which causes problems when he stands or walks, although he labors under no doctor-imposed restrictions. Edward has attended four or five colleges but has never obtained a degree. Edward and his mother jointly own two houses in Calhoun City, one of which, with an assessed value of $72,025.00 and an actual value of $50,000.00, was used as Edward and Teresa's marital home. Since Teresa and the child left, Edward has remained in this home alone. The other home is vacant and has an assessed value of $44,180.00 and an actual value of $30,000.00. The houses were given to Edward and his mother by other relatives prior to the time Edward and Teresa married. Edward lives on the income from trusts, stocks, and bonds, which were provided by his grandparents and his father. Edward is the beneficiary of the Nora Creekmore Trust, valued at $145,000.00 at the time of the hearing. Edward gained control of one-third of this trust when he turned twenty-five (25), a second third when he turned thirty (30), and the final third will be his when he turns thirty-five (35). In the event Edward dies before reaching age thirty-five (35), the final third of the trust will belong to Gentry Shannon. Edward receives no income from this trust but the fund sometimes pays his medical or legal expenses. Edward once drew an income of $2,200.00 a month from a stock account with J.C. Bradford, but when he began making support payments to Teresa, pursuant to the court's temporary order, his income was increased to $3,300.00 a month. This amount of monthly income requires invading the principal of the stock investments. Edward owed his mother about $17,000.00 or $18,000.00 at the time of the hearing, which he had borrowed during the time he was married to Teresa. Edward's stock in Sunburst Bank, valued at $13,260.00, was transferred to his mother as partial security for this debt.
Edward's net worth is valued at $315,365.63. Included in this assessment is a stock portfolio worth $273,811.00, Sunburst Bank stock worth $13,260.00, and personal property valued at $26,700.00; liabilities include a lien on an automobile and personal loan debt to Edward's mother and grandmother. Edward also has real estate holdings, including his one-half interest in the two Calhoun City houses, valued at $47,200.00, which were not included in his net worth statement.
Upon divorce Teresa was awarded permanent custody of Gentry Shannon, $500.00 a month child support, $12,000.00 lump sum alimony, and $12,000.00 periodic alimony to be paid in $500.00 increments for 24 months or until Edward's death, whichever came first. She also received the use of a 1985 Chevrolet Caprice. Edward was ordered to provide a policy of health insurance for Gentry Shannon and Teresa; Teresa and Edward are each responsible for half of any expenses not covered by the policy, including deductibles.
Teresa's appeal presents the following issues:
1. Did the court err in the award to her of 2.6 percent of defendant's estate as lump sum alimony;
2. Did the court err in the award to her of $12,000.00 as periodic alimony to be paid $500.00 per month for a maximum of 24 months; and
3. Did the court err in the amount of attorney fees awarded to plaintiff?
As this Court is not presented with an appeal regarding the chancellor's division of marital property, our recent decisions of Hemsley v. Hemsley, 639 So.2d 909 (Miss. 1994) and Ferguson v. Ferguson, 639 So.2d 921 (Miss. 1994), have no application to the instant case. This is a lump sump alimony *517 case, and the source of the funds is not material.

I.

DID THE COURT ERR IN THE AMOUNT OF LUMP SUM ALIMONY AWARDED?
It is hornbook law that whether to award alimony and the amount to be awarded are largely within the discretion of the chancellor. Cherry v. Cherry, 593 So.2d 13, 19 (Miss. 1991). We will not disturb the chancellor's decision on alimony on appeal unless it is found to be against the overwhelming weight of the evidence or manifestly in error. McNally v. McNally, 516 So.2d 499, 501 (Miss. 1987).
In Cheatham v. Cheatham, 537 So.2d 435, 438 (Miss. 1988), the following factors were considered in awarding lump sum alimony: 1) substantial contribution to accumulation of wealth by quitting job to become housewife or assisting in husband's business; 2) long marriage; 3) separate income or separate estate meager in comparison to that of payor spouse; and 4) financial security without lump sum alimony. Most important is a comparison of the estates. Subsequent to the decision in Cheatham, this Court has consistently employed these four factors when reviewing lump sum alimony. Tilley v. Tilley, 610 So.2d 348, 352 (Miss. 1992); Smith v. Smith, 607 So.2d 122, 126 (Miss. 1992); Cleveland v. Cleveland, 600 So.2d 193, 197 (Miss. 1992). Disparity of the separate estates has continued to be the most compelling factor. Tilley, 610 So.2d at 352.
Edward contends that Teresa is entitled to no lump sum alimony because his assets were not accumulated through the parties' joint efforts, but were inherited from his family. The source of one party's ownership of assets has never been a factor in the determination of a lump sum alimony award. Bland v. Bland, 629 So.2d 582, 587 (Miss. 1993); Pratt v. Pratt, 623 So.2d 258, 262 (Miss. 1993); Tilley, 610 So.2d at 352; Smith v. Smith, 607 So.2d 122, 126 (Miss. 1992). See also, Hemsley, 639 So.2d at 921 (Miss. 1994) (Hawkins, C.J., dissenting).
Teresa does not dispute the chancellor's finding that she did not substantially contribute to Edward's accumulation of wealth. Then again, neither did Edward contribute to his wealth. Teresa's wages during the first five years of marriage did, however, help to conserve Edward's estate and Teresa did quit her job to become a housewife after she and Edward mutually decided that she should stay home with their daughter. Teresa worked for the majority of the time of the marriage and Edward did not. Had he worked during the marriage to increase his assets, Teresa would clearly be entitled to lump sum alimony. To preclude an award of lump sum alimony because a husband did not work during the marriage would be to punish a wife for being a dutiful wife and mother while at the same time rewarding a husband for his idleness. Moreover, this is but one factor to consider in awarding lump sum alimony.
The duration of seven years is long enough to qualify for an award of lump sum alimony, which Edward himself admits. Teresa's separate income and estate are meager in comparison to Edward's and, most importantly, Teresa will enjoy no financial security without lump sum alimony. The chancellor was clearly correct in his award of lump sum alimony.
The amount of the lump sum alimony award is the issue now before the court. Discussing the appropriateness of an amount of lump sum alimony, we said in Gray v. Gray, 562 So.2d 79, 83 (Miss. 1990):
[a]limony, if allowed, should be reasonable in amount, commensurate with the wife's accustomed standard of living, minus her own resources, and considering the ability of the husband to pay.
Teresa is accustomed to a modest but comfortable standard of living and she is limited in the resources she can contribute to that end. Teresa's financial situation is troubling and the concern is compounded by the fact that she has permanent custody of the parties' minor child, which both she and Edward agree is in the child's best interests. Edward is uninsurable, so the chancellor could not order him to obtain a life insurance policy *518 on his own life for Gentry Shannon's benefit; any child support payments for Gentry Shannon will terminate at Edward's death. At present, however, Edward has the ability to pay a reasonable amount in order to secure Teresa's and Gentry Shannon's financial future. Twelve thousand dollars ($12,000.00), or $24,000.00, when both alimony awards are considered in combination, is a meager amount of lump sum alimony, given the parties' respective financial situations, and is grossly inadequate so as to reveal an abuse of discretion. This issue is reversed and remanded to the chancery court for a proper determination of the amount of lump sum alimony.

II.

DID THE CHANCELLOR ERR IN AWARDING PERIODIC ALIMONY FOR A LIMITED DURATION?
Although the learned chancellor labelled a portion of Teresa's alimony "periodic," he limited its duration to twenty-four months and awarded only a fixed sum of money. We are called upon therefore to determine whether the alimony awarded is lump sum or periodic. With or without a label attached, we must look to the substance of what has been provided to determine whether an obligation is lump sum or periodic. Bowe v. Bowe, 557 So.2d 793, 795 (Miss. 1990).
Lump sum alimony may be paid in a single lump sum or in fixed periodic installments and is a final settlement between husband and wife. Armstrong v. Armstrong, 618 So.2d 1278, 1281 (Miss. 1993). A specific period of time for which payments are to run or a fixed sum of money are two characteristics of lump sum alimony. Holleman v. Holleman, 527 So.2d 90, 92 (Miss. 1988); Wray v. Wray, 394 So.2d 1341, 1345 (Miss. 1981). "Lump sum alimony vests in the obligee upon final judgment making the award and becomes an obligation of the estate of the obligor if death occurs before payment." Armstrong, 618 So.2d at 1281. Lump sum alimony is not affected by remarriage of the payee spouse. Bowe, 557 So.2d at 794.
Periodic alimony is associated with support and maintenance of the payee spouse and terminates upon remarriage of the payee. Cunningham v. Lanier, 589 So.2d 133, 136-37 (Miss. 1991). It is, however, the language employed in the decree that is our "primary and ultimate referent." Bowe, 557 So.2d at 795. "[A] decree awarding alimony should be construed as providing for periodic alimony ... unless the decree by clear and express language imports lump sum alimony, or alimony in gross." Wray, 394 So.2d at 1345. The focus of the inquiry is the substance of the provision rather than the label. Armstrong, 618 So.2d at 1281, citing Maxcy v. Estate of Maxcy, 485 So.2d 1077, 1078 (Miss. 1986).
An award of $12,000.00 payable in $1,000.00 increments over a twelve month period, "in lieu of alimony," was found "for all practical purposes, an award of lump-sum alimony" by this Court in Smith v. Smith, 614 So.2d 394, 397-98 (Miss. 1993), and in Holleman, 527 So.2d at 92, this Court said: "[a] fixed and certain sum of money which is due and payable over a definite period of time is clearly alimony in gross, or lump sum alimony... and not periodic alimony."
The only provision placed on the award of "periodic alimony" by the chancellor in the instant case which is actually characteristic of periodic alimony is that payments are to cease at Edward's death. All other indicators point to lump sum alimony. Teresa's "periodic alimony" in the amount of $12,000.00, to be paid in $500.00 monthly increments over a period of twenty-four (24) months, is, for all practical purposes, an award of lump sum alimony, in addition to the $12,000.00 appropriately labelled "lump sum alimony," and will become an obligation of Edward's estate should he die before the amount has been paid.
Edward is mistaken in his reliance on Holleman; Jordan v. Jordan, 510 So.2d 131 (Miss. 1987), and Gatlin v. Gatlin, 248 Miss. 868, 161 So.2d 782 (1964), for the proposition that this Court has approved time limited periodic alimony. Only Gatlin comes close to supporting Edward's argument. We affirmed the chancellor's award of alimony in the amount of $200.00 a month for eighteen *519 months, but modified the award by requiring the chancellor to retain jurisdiction of the question of alimony. Although we did not say the chancellor should allow alimony after the eighteen month period had run, we stated that reconsideration of the issue may or may not be appropriate, depending upon what circumstances might be developed at a later hearing.
In Armstrong, the chancellor awarded the wife "rehabilitative" alimony of $175.00 a month for two years. Despite its label, we found the time-limited alimony award was lump sum alimony. Armstrong, 618 So.2d at 1281. The award of time-limited alimony was reversed and rendered by this Court, awarding the wife periodic alimony in the same monthly sum until her death, remarriage, or modification of the award, following a proper showing, by the trial court. Id.
[The wife], through no fault of her own, is departing a 21 year marriage with primary custodial responsibility for two minor children. She is embarking on a new course in life with little formal education and meager job experience to equip her for her journey. Under the facts of this case, equity requires more than the time-limited award. [She] is entitled to periodic alimony as a flexible means of protecting her needs as they arise during her unmarried status, if [the husband] is financially able to assist her.
Armstrong, 618 So.2d at 1281. The same can be said of Teresa, although the Creekmores' marriage lasted only seven years and produced but one child. However, lump sum alimony, rather than periodic, may be the best means of providing for Teresa's financial security due to the particular facts of this case.
Edward has a net worth of at least $315,000.00, the accumulation of which is in no way due to his hard work or financial savvy. Edward does not work and is not likely to, given his physical "disability" and his drug/alcohol induced "functional disability." What he is likely to do is continue along the path he has followed so far, doing nothing to conserve or increase his financial resources. While a guardian ad litem of Edward's person and estate was appointed, this appointment was to last only until the conclusion of the divorce. Given Edward's addictions, the prospects of long life seem slim. It would be in Teresa's and Gentry Shannon's best interests that Edward help secure their financial future now, while he is clearly able to do so, via an adequate award of lump sum alimony. Lump sum alimony will provide security for Teresa and Gentry Shannon in the event of Edward's early death, in contrast to periodic alimony, which ceases to exist with Edward.
As the time-limited alimony is lump sum alimony, the total award of lump sum alimony awarded is twenty-four thousand dollars ($24,000.00). The amount of lump sum alimony should be reasonable, in line with the wife's accustomed standard of living, and should consider both her own resources and her husband's ability to pay. Gray, 562 So.2d at 83.
Along with custody of Gentry Shannon, Teresa is obligated to pay one-half of all medical, dental, pharmacy, hospital, and optometry expenses, including deductibles, not covered by the insurance policy which Edward is to provide. Teresa was awarded a 1985 automobile, which in all likelihood will not be reliable much longer, if indeed it is still reliable at this time. Teresa would like to buy a home for herself and Gentry Shannon in Belzoni, and has looked at homes priced in the $30,000.00 range, which is far from extravagant. Teresa's college tuition will also be a hefty expense, as will daycare for Gentry Shannon.
Teresa's estimated minimum monthly expenses total $1,600.00 and consist of $350.00 for rent [or house note]; $150.00 for utilities; $75.00 for telephone; $300.00 for food; $100.00 for gasoline, oil, and maintenance; $50.00 for car tags and insurance; $100.00 for medical, dental, drugs, and vitamins; $150.00 for clothing; $100.00 for miscellaneous household expenses, sundries, entertainment, and charities; $175.00 for daycare; and $100.00 for furniture. These estimates, while only that, appear quite frugal and do not include allowances for Teresa's college tuition or for a car note. The $100.00 monthly estimate for medical, dental, drugs, and vitamins is likely to be far less than the actual cost of providing these necessities. If *520 Teresa receives $500.00 a month child support, $500.00 a month "lump sum" payments, and works twenty (20) hours a week at her present job, earning gross monthly wages of $340.00, her gross monthly income of $1,340.00 will not suffice to cover even these minimal estimated expenses. As a result, Teresa will have to invade the remaining $12,000.00 amount of lump sum alimony awarded just to make ends meet, not to mention to pay college tuition, to make a down payment on a house, or to purchase a new automobile.
The total lump sum alimony award of $24,000.00 is grossly inadequate so as to reveal an abuse of discretion. This award does not allow Teresa to maintain anything near her accustomed standard of living and does not reflect a consideration of her lack of available resources nor of Edward's ability to pay. The awards of lump sum alimony are reversed and remanded in order that an appropriate amount be awarded.

III.

DID THE COURT ERR IN THE AMOUNT OF ATTORNEY FEES AWARDED?
The award of attorney fees in divorce cases is left to the discretion of the chancellor, assuming he follows the appropriate standards. Adams v. Adams, 591 So.2d 431, 435 (Miss. 1991). Attorney fees are not generally awarded unless the party requesting such fees has established the inability to pay. Dunn v. Dunn, 609 So.2d 1277, 1287 (Miss. 1992). "The fee should be fair and should only compensate for services actually rendered after it has been determined that the legal work charged for was reasonably required and necessary." Dunn, 609 So.2d at 1286. When considering an award of attorney fees,
a sum sufficient to secure a competent attorney is the criterion by which we are directed. The fee depends on ... relative financial ability of the parties, the skill and standing of the attorney employed, the nature of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the cause, the time and labor required, the usual and customary charge in the community, and the preclusion of other employment by the attorney due to the acceptance of the case.
Smith v. Smith, 545 So.2d 725, 729 (Miss. 1989), quoting McKee v. McKee, 418 So.2d 764, 767 (Miss. 1982). Attorney fees have been refused "where little or no evidence has been presented to substantiate the amount requested." Cooley v. Cooley, 574 So.2d 694, 698 (Miss. 1991). Unless the chancellor abused his discretion or is manifestly wrong, his decision regarding attorney fees will not be disturbed on appeal. Armstrong, 618 So.2d at 1282; Dunn, 609 So.2d at 1287; Trunzler v. Trunzler, 431 So.2d 1115, 1116 (Miss. 1983).
Teresa testified that she was unable to pay her $3,422.50 attorney fee in October of 1991 and there is no evidence to the contrary anywhere in the record. Following the October 1991 hearing, when Teresa rested, various continuances, additional hearings, and depositions, all at Edward's request, increased Teresa's attorney fees and expenses to a total of $8,393.75. Teresa can not pay this amount either. The services listed on Teresa's attorney's itemization were actually rendered, as testified to by Teresa, and the work was reasonably required and necessary, as testified to by Teresa's attorney.
Evidence of most McKee factors is available in the record: Edward's ability and Teresa's inability to pay, counsel's skill or standing, domestic case without novel issues, counsel had great degree of responsibility as lead counsel, 79.70 hours and an itemization of the work performed for every tenth of an hour, and the usual and customary charge in the community, which was contested  $95.00 per hour according to counsel for Teresa, $70.00 to $75.00 an hour according to an attorney called to testify on this issue for Edward. The only McKee factor on which no evidence was presented is the preclusion of other employment as a result of this case. To substantiate the amount requested, Teresa's attorney testified and offered into evidence an itemization of her expenses and charges.
*521 The chancellor found that the case could have been concluded in much less than 79.70 hours, that $8,393.75 is grossly excessive, and that Teresa's and Edward's attorneys were equally at fault in causing a portion of the excessive time. Teresa was awarded only $2,500.00 attorney fees.
In Boykin v. Boykin, 565 So.2d 1109 (Miss. 1990), appellee's requested attorney fees were $5,400.00  $100.00 an hour for fifty-four (54) hours of services provided over a period of eight months. The chancellor awarded $4,000.00 and this Court affirmed because evidence of the McKee factors had been presented. Boykin, 565 So.2d at 1115-16. In Holleman, attorney fees of $18,675.00 were awarded by the chancellor for 168.21 hours and expenses. This Court reversed and remanded for a hearing in which the necessary evidence could be presented because the McKee factors had not been satisfied. Holleman, 527 So.2d at 95-96. And in Griffin v. Griffin, 579 So.2d 1266 (Miss. 1991), the chancellor's award of $4,450.00 was reversed and remanded because the fee had been allowed in an ex parte hearing without notice and due process to the other party and it was not clear whether the fees included services performed in conjunction with a motion for contempt in addition to the sum due for the divorce. Griffin, 579 So.2d at 1268.
As all McKee factors save one have been satisfied in this case, it is patent that Teresa can not pay her attorney fees, the amount of the fee awarded is meager in comparison to the amount requested, and since the chancellor found both parties' attorneys contributed to the amount of excessive time, we find an abuse of the chancellor's discretion. This issue is reversed and remanded. On remand, Teresa's attorney should be allowed the opportunity to present evidence of employment preclusion as a result of the Creekmore divorce case, the chancellor should specify the excessive hours and services caused by Teresa or her counsel, and an appropriate award of attorney fees should be made. Regarding the contested customary charge in the community, the chancellor is in a better position than is this Court to know what is customary in his community.
The chancellor was concerned about an episode of alleged improper conduct on the part of Teresa's counsel and stated on the record that he would consider such conduct when determining the issue of attorney fees. If indeed Teresa's counsel behaved in an inappropriate manner, Teresa played no role in such behavior and should not suffer the consequences. However, if the alleged improper conduct unnecessarily increased the amount of attorney fees, the amount awarded should be decreased by the amount of any unnecessary fees. Any other consideration of counsel's improper conduct in the determination of attorney fees, that is, to sanction the client (by awarding nominal attorney fees) for her attorney's improper behavior, is an inappropriate response.
The $12,000.00 award of "periodic" alimony is actually a lump sum award and, contrary to the chancellor's provision, Edward's death does not relieve him or his estate from that obligation. In combination with the other $12,000.00 award, a total of $24,000.00 lump sum alimony was awarded. This combined amount does not allow Teresa to maintain anything near her accustomed standard of living and does not reflect a consideration of her lack of available resources nor of Edward's ability to pay. On the facts and circumstances of this case, an award of $24,000.00 lump sum alimony is so grossly inadequate as to reveal an abuse of discretion on the part of the chancellor and is reversed and remanded for a lump sum award which achieves some sense of proportion in accordance with the caselaw of this state.
The award of $2,500.00 attorney fees is reversed and remanded in order that Teresa be given an opportunity to present evidence of the one McKee factor not yet satisfied. If improper conduct on the part of Teresa's counsel unnecessarily increased the amount of attorney fees due, the amount awarded on remand should be decreased only by the amount attributable to Teresa's attorney's misbehavior. Aside from such a reduction, her attorney's improper conduct should not be considered in determining the amount of attorney fees to be awarded to Teresa Creekmore.
*522 REVERSED AND REMANDED TO THE CHANCERY COURT OF CALHOUN COUNTY.
HAWKINS, C.J., PRATHER, P.J., and PITTMAN, BANKS, McRAE and SMITH, JJ., concur.
DAN M. LEE, P.J., dissents with separate written opinion joined by JAMES L. ROBERTS, Jr., J.
DAN M. LEE, Presiding Justice, dissenting:
Based on a careful review of the record, the chancellor's awards to Teresa evidenced no abuse of his discretion in the award of lump-sum alimony; the award of periodic transitional alimony was proper under the circumstances; and the chancellor correctly limited the award of attorney's fees.
Therefore, I respectfully dissent.

I.

A.

WHETHER THE COURT ERRED IN THE AMOUNT OF LUMP SUM ALIMONY AWARDED.
This Court will interfere with the award of alimony only where the chancellor's decision is unjust or grossly inadequate so as to evidence an "abuse of discretion." McNally v. McNally, 516 So.2d 499 (Miss. 1987). The "amount" of alimony to be awarded is a matter primarily committed to the discretion of the chancery court because of the chancellor's opportunity to evaluate the equities of the particular situation. Tilley v. Tilley, 610 So.2d 348 (Miss. 1992); Holleman v. Holleman, 527 So.2d 90 (Miss. 1988).
Teresa testified that she was only requesting alimony until she "got on her feet." In addition, answers to questions by Eddie's attorney indicated that Teresa was only seeking alimony for the two-year period it would take her to complete her education and enter the teaching profession; her concern was for financial security for the following twenty-four months while she was completing her education. Neither Teresa nor her attorney requested permanent alimony, only lump sum alimony or transitional alimony.
The chancellor's expressions of the terms and effect of the alimony awards are crystal clear, leaving no doubt that he intended to make separate and distinct awards of lump-sum alimony and an award of periodic alimony for a limited duration. The "FINAL JUDGMENT OF DIVORCE" states, inter alia, as follows:
Defendant [Eddie] is ordered to pay to Plaintiff [Teresa] as lump sum alimony the sum of $12,000.00 cash on or before February 15, 1992.
Defendant [Eddie] is ordered to pay to Plaintiff [Teresa] as periodic alimony $500.00 per month beginning on March 15, 1992, with a like payment due on the 15th day of each month thereafter for 24 months or until Defendant dies or Plaintiff dies or until Plaintiff remarries whichever occurs first.
The majority's argument that "[g]iven Eddie's addictions, the prospects of a long life seem slim. It would be in Teresa's and Gentry Shannon's best interests that Edward help secure their financial future now, while he is clearly able to do so, via an adequate award of lump sum alimony." is speculative, at best, and this Court's duty is to consider the facts as they exist in the record.
The chancellor awarded Teresa $500.00 per month in child support, $12,000.00 in lump-sum alimony, and $500.00 per month in periodic "transitional" alimony, payable for a fixed period of twenty-four months (or $12,000.00), but which would terminate sooner upon either the death of Teresa or Eddie, or upon re-marriage by Teresa. Thus, averaged over the two-year period which Teresa testified it would take her to get back on her feet, the total monetary support granted to Teresa is $1,500.00 per month. Therefore, the majority's contention that "her gross monthly income of $1,340.00 will not suffice to cover even these minimal estimated expenses. As a result, Teresa will have to invade the remaining $12,000.00 amount of lump sum alimony awarded just to make ends meet," ignores the purpose and intent of the chancellor's award; i.e., to be used to support Teresa while she "gets on her *523 feet." It is not this Court's decision, but Teresa's, as to whether or not she should "invade" the $12,000.00 lump sum alimony award. The chancellor's total award of $1,500.00 per month is sufficient for the purpose intended (an extra $12,000.00 in monetary support to enable Teresa to attend college), and, when combined with her ability to work part time and earn at least $340.00 per month, the chancellor's awards evidence no abuse of his discretion.
The substance of the transitional alimony which the chancellor awarded is unmistakable. It is a hybrid, possessing traditional characteristics of both periodic alimony and lump-sum alimony. The transitional alimony granted by the chancellor is similar to permanent periodic alimony in that a fixed amount was ordered to be paid at regular intervals, and it is terminable upon re-marriage of the payee spouse or death of either the payor or payee spouse. But, that feature of the award which requires that the alimony payments be made only until attainment of accumulated total payments of $12,000.00, a sum certain, is normally thought of as an attribute of lump-sum alimony that is payable over a specified time period.
In the recent case of Hemsley v. Hemsley, 639 So.2d 909 (Miss. 1994), we affirmed the chancellor's award of periodic alimony which did not possess the characteristic of a fixed dollar amount of payments that would continue unchanged until termination of the periodic alimony, a feature which this Court had previously stated was a necessary characteristic of periodic alimony. In affirming the lower court in Hemsley, this Court stated that:
The chancellor ordered that Bitsy's alimony be reduced by her share of the retirement benefits once Mike started to receive his benefits. The chancellor stated the following:
... Therefore, the periodic alimony will self-adjust by reducing the amount in proportion to the amount received when the plaintiff commences to receive those benefits or when the defendant retires and no longer has a regular employment income.
Hemsley v. Hemsley, 639 So.2d 909, 915 (Miss. 1994).
A chancellor's awards of alimony need not possess all the characteristics of either periodic or lump-sum alimony. Hemsley, at 915. Hybrid forms of alimony are not only permitted to be devised by the chancellor, but are, on occasion, most appropriate in situations where the income of the parties is reasonably expected to change subsequent to the transition from life as a married person. In Hubbard v. Hubbard, 92-CA-01031-SCT, (not yet reported) the lower court, relying on the factors of Brabham v. Brabham, 226 Miss. 165, 176, 84 So.2d 147, 153 (1955), stated:
[P]laintiff is awarded alimony in the amount of $600 per month for a period of thirty-six (36) months.
This sum is sufficient, together with plaintiff's other income, to sustain her and give her a chance to recover her health and to save her business, and if the business fails, to help her until she can re-enter the work force.

Hubbard, slip op. at 7. (emphasis in original)
As stated in Hubbard, "rehabilitative periodic alimony, synonymous with `periodic transitional alimony' in Dufour, is a separate and equitable tool for chancellors to use in their discretion" and this method, applied to the case sub judice, is both practical and reasonable. Hubbard, slip op. at 11.
The transitional alimony, awarded in addition to lump-sum alimony, was both prudent and practical in providing for Teresa during the twenty-four months for attending college. The utilization of transitional alimony assured Teresa of sufficient monthly income during the time that she was "getting on her feet." In addition, the award also insured that Teresa could seek modification of the amount of monthly alimony, during that two-year period, if she were unable to consummate her future plans. By contrast, if the chancellor's award were deemed lump-sum alimony, it would not be modifiable, regardless of any hardships which might befall Teresa.
The chancellor did not abuse his discretion in awarding Teresa transitional alimony. *524 The award is a very practical method to provide for Teresa while she "gets on her feet," yet maintains the flexibility to be adjusted upwards if Teresa's plans are not fulfilled, as both she and the chancellor contemplated.

B.

WHETHER THE COURT ERRED IN LIMITING THE AMOUNT OF THE AWARD OF ATTORNEY'S FEES.
The determination of whether to award attorney's fees is, as with alimony, largely within the discretion of the chancellor. Smith v. Smith, 614 So.2d 394 (Miss. 1993) (citing Martin v. Martin, 566 So.2d 704 (Miss. 1990); Devereaux v. Devereaux, 493 So.2d 1310 (Miss. 1986); Kergosien v. Kergosien, 471 So.2d 1206 (Miss. 1985)). As such, we are hesitant to disturb a chancellor's decision to award or deny payment of attorney's fees to a party, as well as the amount of an award, if any. Smith, 614 So.2d at 398 (citing Geiger v. Geiger, 530 So.2d 185, 187 (Miss. 1988)). Unless an abuse of discretion is found, the chancellor's decision concerning an award of attorney's fees will generally be upheld. Armstrong v. Armstrong, 618 So.2d 1278, 1282 (Miss. 1993); Martin v. Martin, 566 So.2d 704, 707 (Miss. 1990); Kergosien v. Kergosien, 471 So.2d 1206, 1212 (Miss. 1985); Ladner v. Ladner, 436 So.2d 1366, 1375 (Miss. 1983).
The discretion of the chancellor in awarding attorney's fees is limited by reasonableness, based upon the factors announced in McKee v. McKee, 418 So.2d 764 (Miss. 1982), which include: 1) the relative financial condition of the parties, 2) the skill and standing of the attorney, 3) the nature of the case, 4) the novelty and difficulty of the issues raised, 5) the time and labor involved, 6) the usual and customary charges for such services prevailing in the community, and 7) the extent that the attorney's representation of the litigant has precluded acceptance of other cases by that attorney. McKee, 418 So.2d at 767. See also, Holleman v. Holleman, 527 So.2d 90 (Miss. 1988); Carpenter v. Carpenter, 519 So.2d 891 (Miss. 1988). We have further commented on the award of attorney's fees, stating that, "[t]he fee should be fair and should only compensate for services actually rendered after it has been determined that the legal work charged was reasonably required and necessary." Dunn v. Dunn, 609 So.2d 1277, 1286 (Miss. 1992) (emphasis added).
Teresa's attorney's fees were approximately $7,571.50. Additionally, she was charged $822.25 for expense reimbursement, yielding a grand total of $8,393.75. In awarding Teresa $2,500.00, but denying her the full $8,393.75, the chancellor stated the following in his "OPINION":
This Court, based upon almost 25 years of litigation practice and a little over 12 years on the Bench, believes that this case could have been concluded satisfactorily in much less than 79.70 hours. It's the judgment of this Court that $8,393.75 is grossly excessive, even though some of the time was caused by Mr. Gibson [Eddie's Attorney]. It's the judgment of this Court that an equal portion of excessive time was caused by Mrs. Wegener [Teresa's Attorney].
Based upon the record, the chancellor correctly awarded a sufficient amount to Teresa to compensate her for attorney's fees. In addition, regardless of the relative financial condition of the parties, the losing litigant should not be saddled with the unreasonable charges made by the other party's attorney. Testimony in the record reveals that the hourly rate charged by Teresa's attorney was $95.00 per hour  higher than any other rate charged by other competent attorneys who performed similar legal services in the community (maximum $70-75 per hour). Additionally, the chancellor determined that "all" the legal services charged to Teresa were "not reasonably required and necessary."

CONCLUSION
As stated above, Teresa was awarded both lump sum alimony and transitional alimony. The chancellor's limitation of the award of attorney's fees to Teresa, considering the McKee factors, and based upon the testimony and evidence contained in the record, was warranted and justified.
*525 Finally, it should be recognized that the chancellor's award of "periodic transitional alimony" did not constitute an award of lump-sum alimony. This award was crafted onto the periodic alimony award in order to allow Teresa to complete her college education and become a teacher within two years. Monthly alimony during that time was an appropriate means to support her. However, plans are not always fulfilled and unanticipated events sometimes intervene to aggravate or hinder matters. As a consequence of the periodic characteristic of the transitional alimony award, if a material change in circumstances occurs before the termination of the transitional alimony payment period, or fulfillment of the terms of transitional alimony, Teresa may seek a "modification" of that award.
Accordingly, I dissent.
JAMES L. ROBERTS, Jr., J., joins this opinion.