565 So.2d 1109 (1990)
Henry Wesley BOYKIN
v.
Betty R. BOYKIN.
No. 07-CA-59612.
Supreme Court of Mississippi.
June 27, 1990.
Jerry Campbell, Vicksburg, for appellant.
Mark W. Prewitt, Vicksburg, for appellee.
Before ROY NOBLE LEE, C.J., and PRATHER and PITTMAN, JJ.
PRATHER, Justice, for the Court:

I. INTRODUCTION
Henry Wesley Boykin contends that the chancellor's award of alimony was "grossly excessive" and constitutes an abuse of discretion. This Court rejects Henry's contention, affirms the judgment in part, and remands in part for purposes of clarification.

A. Factual Background
Henry and Betty Boykin were married on February 14, 1975. Almost thirteen years later, on December 5, 1987, Betty filed for divorce. No children were born of the marriage.
A lengthy hearing was held, after which the chancellor granted the divorce on the undisputed grounds of adultery and habitual cruel and inhuman treatment.
Pursuant to the divorce decree, Betty was awarded: (1) monthly alimony of $700.00 until July, 2001, at which time the *1110 sum will be reduced to $550.00; (2) the home, furnishings, and 1986 Mercury automobile; (3) a lien on one-third of Henry's gross federal civil service retirement benefits; and (4) attorney's fees in the sum of $4,000.00. In addition, Betty was held responsible for: (1) payment of a $25,000.00 home mortgage; (2) a monthly car payment of $315.00; and (3) maintenance of the home's interior.
Henry was awarded all personal property that was in his immediate possession  including a 1987 pick-up truck, a restored '55 chevrolet, a "runabout" pleasure boat, a fourteen-foot fishing boat, a camper trailer, a 1976 bulldozer, a television, a videocassette recorder, and tools. In addition to his responsibilities delineated in the preceding paragraph, Henry must maintain the home exterior.
Henry appealed the terms of the divorce decree, and presents numerous issues for disposition.

B. The Issues
The issues presented by Henry have been paraphrased or consolidated for purposes of brevity and avoidance of undue repetition:
(1) Whether the amount and duration of the award of periodic alimony are excessive?
(2) Whether the award of the home and furnishings is excessive?
(3) Whether requiring Henry to maintain the home's exterior constitutes an abuse of discretion?
(4) Whether the award of a lien on one-third of Henry's retirement funds is "vague, misleading, and without basis?"
(5) Whether the award of $4,000.00 in attorney's fees is excessive?
Henry presented one other issue which is deemed moot. Henry asked: Whether requiring him to maintain the home's interior constitutes an abuse of discretion? The final decree requires Betty  not Henry  to maintain the interior; Henry must only maintain the exterior.

II. ANALYSIS
The analysis will consider the issues in the order in which they are listed in the preceding section.

A. Issue One
This subsection comprises two discussions regarding Henry's contention that the amount and duration of periodic alimony awarded are excessive.

1. The Amount
In support of his contention that the amount is excessive, Henry provides the following logic:
[Henry's] total expenses ... per year is [sic] $29,126.00, and the total income ... per year is $41,549.00. If you take his total expenses from his total income you are left with a balance of $12,413.00. Subtracting the ... award of ... $700.00 per month, [Henry] is left with a disposable income of $4,013.00. The take-home income of [Betty] is $10,400.00 per year. Her total expenses is [are] $13,956.00 per year. This leaves her with a negative difference of $3,556.00 per year. If you add in her alimony payments ... she is left with a disposable income of $5,000.00 per year.
... [Thus, Betty] has more disposable income than [Henry] ...
[And t]aking into consideration the award of the marital home ..., the furnishings ..., [and] the requirement that [Henry is] responsible for maintaining [the home's] exterior ..., the award of $700.00 per month ... is grossly excessive.
Basically, Betty counters that the chancellor's determination is supported by law and the facts contained in the record. This Court concurs with Betty's position.
In Brabham v. Brabham, factors which must be considered in determining alimony awards were delineated: (1) the parties' health, (2) the parties' income and earning capacity, (3) the parties' expenses vis-a-vis reasonable necessities, (4) the wife's free use of home, furnishings, and automobile, and (5) any other relevant facts and circumstances. 226 Miss. 165, 176-77, 84 So.2d 147, 153 (1955); see also McNally v. *1111 McNally, 516 So.2d 499, 501 (Miss. 1987); Skinner v. Skinner, 509 So.2d 867, 868 (Miss. 1987). In making the determination, the chancellor is accorded broad discretion due to his "peculiar opportunity to sense the equities of the situation before him." Holleman v. Holleman, 527 So.2d 90, 94 (Miss. 1988). Before this Court may reverse a chancellor's determination, a party must present sufficient evidence reflecting an abuse of discretion. Skinner, 509 So.2d at 869; Wood v. Wood, 495 So.2d 503, 507 (Miss. 1986); Tutor v. Tutor, 494 So.2d 362, 364 (Miss. 1986). Restated, the chancellor's determination must be reasonable and commensurate with the wife's accustomed standard of living  taking into account the wife's own resources and the husband's ability to pay. Wood, 495 So.2d at 506; Rainer v. Rainer, 393 So.2d 475, 478 (Miss. 1981).
Applying case law to the case sub judice, the undisputed facts reveal that  at the time of the hearing  both parties were in good health. Henry was forty-eight years old, and Betty was forty-nine. Henry was a "deck hand" in his twenty-sixth year with the U.S. Army Corps of Engineers  earning an annual salary of $41,000.00. Betty was a purchasing agent in her eighth year with the Vicksburg Medical Center  earning an annual salary of $13,624. Henry attended high school through the tenth grade; Betty graduated high school. Betty is not receiving "free use" of the home or automobile; pursuant to the divorce decree, she is responsible for paying the notes on both. Henry, on the other hand, bears absolutely no responsibility for payment of the notes on the home and her automobile  although the chancellor's calculation of periodic alimony probably accounted for her having to meet these monthly expenses (i.e., $388.00 monthly for the home, and $315.00 monthly on the automobile). The record refers to "their" home which apparently means that the title is jointly held. Betty's payment of the monthly payment inures to improvement of his equity. In a nutshell, the terms of the decree place both parties in nearly identical financial positions.[1]
The chancellor's determination was well within his discretionary authority. At this point in time, the award seems fair; Henry's own testimony at the hearing supports this conclusion:
Question: Do you feel that [Betty] can support herself and [maintain] the standard of living that she had grown accustomed to with you without your help ...?
Henry: Not really.
.....
Question: What do you feel you should pay your wife as alimony ...?
Henry: Well, as she stated [during testimony] ... she couldn't make it on ... the $550.00 [which Henry provided her each month during their separation]. Maybe $50.00 more a month, say $600.00 a month... .
.....
[S]he said sometimes she didn't have enough hardly to make it on... . I would even go to $650.00. I mean just because I know it is hard... .
See Tutor, 494 So.2d at 363 ("Tutor himself acknowledges that the periodic monthly alimony payments awarded by the chancellor ... were equitable. [Thus, t]here is no merit to this assignment."). Henry additionally admits in his brief that the alimony will allow Betty to "maintain[] her same style of living." Appellant's Brief at 11. His primary grievance, therefore, seems to simply be that the award (allegedly) will provide Betty with slightly "more disposable income than [him]." See supra (foot)note 1 (Henry failed to substantiate the allegation that a disparity will result). Assuming, arguendo, that the alleged disparity will result, this clearly would not be sufficient to prove an abuse of discretion. And by admitting that he will be left with nearly $5,000.00 in "disposable" income, *1112 Henry is conceding that he can afford the award. In the future, Henry may seek a modification if a change in economic circumstances or financial position transpires.
In sum, the chancellor's determination regarding periodic alimony is affirmed.

2. The Duration
Henry also contends that "an award of periodic alimony which terminates only upon death or remarriage of the wife" is excessive. The brief, however, is devoid of any substantiation or, more specifically, authoritative support. See MISS.SUP.CT. Rules 28(a) & (a)(6) ("The brief of the appellant ... shall contain the contentions ... with respect to the issues presented, and the reasons for those contentions, with citations to authorities, statutes and parts of the record relied on."); Read v. Southern Pine Elec. Power Ass'n, 515 So.2d 916 (Miss. 1987) (case in which this Court declined to address issue presented by party who failed to cite authoritative support); Devereaux v. Devereaux, 493 So.2d 1310 (Miss. 1986) (same); Nelson v. Clanton, 263 So.2d 787 (Miss. 1972) (same). This notwithstanding, examination of applicable law leads this Court to conclude that Henry's contention is without merit.
The general rule dictates that periodic alimony terminates upon death or remarriage. Skinner, 509 So.2d at 869 (citing Wray v. Wray, 394 So.2d 1341, 1344 (Miss. 1981)). This rule is subject to change on an ad hoc basis. Skinner, 509 So.2d at 869 (citing East v. East, 493 So.2d 927 (Miss. 1986)). Thus, Henry's only remedy would have been to show that the chancellor should have deviated from the general rule in his case; no showing was made. See Tutor, 494 So.2d at 363 ("As to the assignment that a time limit should be fixed to the periodic monthly alimony payments, ... [n]o law is cited to support this contention and we have found no law to support it[; therefore t]here is no merit to this assignment."); Clark v. Clark, 293 So.2d 447, 450 (Miss. 1974) ("We hasten to add that short of death or remarriage, the ... duration of an alimony award ... is entirely within the sound discretion of the chancellor.").
In sum, an abuse of discretion is not evident. The chancellor's determination regarding duration of periodic payments is affirmed.

B. Issue Two
Henry contends that the chancellor erred by requiring him to maintain the home's exterior. Henry's brief, however, is devoid of substantiation or authoritative support; in fact, the issue is not even addressed. Under authority of Mississippi Supreme Court Rules and case law, this Court should refuse to address the issue. This notwithstanding, the record and applicable law were examined, and no support for Henry's contention was found.
In sum, the contention lacks merit. The chancellor's determination regarding this issue is affirmed.

C. Issue Three
Henry contends that the chancellor erred by awarding Betty the home and furnishings. Once again, no authoritative support was cited in Henry's brief, nor was the issue even addressed. Once again, this Court should refuse to address the issue. This notwithstanding, the record and applicable law were examined; no support for the contention was found.
Interestingly, Henry's contention seems to contradict the position he held at the time of the hearing. His own testimony reveals that he thought the chancellor should "let her live in the house" and "keep" the furniture. Henry did, however, add that her use of the home should be limited to five years; he did not, however, suggest any limitations on her "keeping" the furnishings. Henry's grievance then seems to concern the duration of her use of the home  as opposed to her use of it at all.
In addition to Henry's concession during the hearing that Betty should be permitted to use the home and keep the furnishings, case law is supportive of the chancellor's determination. See, e.g., Ladner v. Ladner, 436 So.2d 1366, 1375 (Miss. 1983) ("We hold that the chancellor did not abuse his *1113 discretion in [awarding] use of the home."); Savell v. Savell, 290 So.2d 621, 624 (Miss. 1974) ("The awarding of the use and occupancy of the home place to the [wife] was an integral part of the support due by a husband to his wife."); Buckalew v. Stewart, 229 So.2d 559, 562 (Miss. 1969) ("The court may ... order the surrender of the possession of a family home to a wife and children as an incident to their support by way of providing necessary shelter or lodging."); cf. Regan v. Regan, 507 So.2d 54, 58 (Miss. 1987) ("Provision that the [wife] shall have exclusive use and possession of the former marital residence is certainly within the Chancery Court's authority for the `maintenance of the children of the marriage.'"). This Court bears in mind that Betty's use of the home does not mean free use; she is responsible for paying off a $25,000.00 mortgage.
In sum, no abuse of discretion is evident. The chancellor's determination regarding this issue is affirmed.

D. Issue Four
The chancellor "awarded" Betty "a lien on one-third (1/3) of Defendant's gross Federal Civil Service Retirement ... Benefits as provided by Federal Law with a lien hereby being imposed thereon." Henry contends that the award is "baseless" and "vague."
The chancellor did not specifically cite his authority for awarding a "lien" on Henry's civil service retirement benefits. Research reveals no published opinion in which this matter was addressed by this Court. Henry's brief refers to 5 U.S.C. § 8345. See Appellant's Brief at 18; but see Appellee's Brief at 10 (where Betty refers to 5 U.S.C. § 8341(h)(1), an enactment which concerns "survivors" of deceased civil service retirees).
According to Henry, § 8345 "requires that the language of the decree be clear and unambiguous as to its intended purposes"; he then concluded that "[t]his is not true in this case." Appellant's Brief at 18 (also citing McDannell, 716 F.2d at 1063). Henry failed to quote the specific passage of § 8345 which he cites as requiring "the language of the decree [to] be clear," and examination of § 8345 did not reveal the passage to which he was referring.
In part, § 8345 provides:
[j](1) Payments ... which would otherwise be made to an employee, Member, or annuitant based upon his [civil] service shall be paid (in whole or in part) by the Office [(of Personnel Management) [hereinafter OPM]] to another person if and to the extent expressly provided for in the terms of any court decree of divorce, annulment, or legal separation, or the terms of any court order or court-approved property settlement agreement incident to any court decree of divorce, annulment, or legal separation. Any payment under this paragraph to a person bars recovery by any other person. [j](2) Paragraph (1) shall only apply to payments made by [OPM] under this subchapter ... after the date of receipt in [OPM] of written notice of such decree, order, or agreement, and such additional information and documentation as [OPM] may prescribe.
This enactment [hereinafter Act] was founded upon the premise that marriage is a partnership in which "each spouse makes a different, but an important, contribution and should have a legal right to a portion of the earnings of the other spouse." See Annuity Provisions for Former Spouses: Hearings on H.R. 3951 Before the Subcomm. on Compensation and Employee Benefits of the House Comm. on Post Office and Civil Serv., 95th Cong., 1st Sess. 29 (1977) [hereinafter Hearings]. In 1977, when the Act was in bill form, the Civil Service Commission (then in charge of disbursing retirement benefits) (now the responsibility of OPM), argued that state courts were in a better position to apportion civil service retirement benefits equitably between former spouses  on an ad hoc basis. See H.R. REP. NO. 713, 95th Cong., 1st Sess. 7-8 & 10 (1977) [hereinafter HOUSE REPORT]; S. REP. NO. 1084, 95th Cong., 2d Sess., reprinted in 1978 U.S.CODE CONG. & ADMIN.NEWS 1379 [hereinafter SENATE REPORT]. The *1114 Commission's argument was accepted; consequently, the Act defers to state courts the ad hoc determination of the means to equitable apportionment of civil service retirement benefits. See 124 CONG.REC. 419-20 (1978) (statements of Congresswomen Schroeder and Spellman); Hearings at 103, 128-29. Providing state courts with such authority averts the risk of dual payments. See HOUSE REPORT at 7 & 10. In other words, OPM will make payments "after ... receipt ... of written notice of [the divorce] decree ... and such additional information and documentation as [OPM] may prescribe." 5 U.S.C. § 8345(j)(2) (emphasis added). Upon "receipt ... of written notice," ... "payment [of retirement benefits] bars recovery by any other person." Id. § 8345(j)(1). In sum, OPM will comply with a court's divorce decree which delineates apportionment (e.g., percentage of gross retirement benefits which a former spouse of a civil service retiree will receive) and method of payment (e.g., whether a former spouse will receive direct payments of retirement benefits from OPM or from her former spouse-civil service retiree). See generally McDannell, 716 F.2d at 1064-66 (citing Retirement and Withholding Tax Legislation: Hearings on S. 224, H.R. 4319, H.R. 4320, H.R. 8342, H.R. 8771, H.R. 9491, Before the Senate Subcomm. on Civil Serv. and Gen. Servs. of the Senate Comm. on Govtl. Aff'rs, 95th Cong., 2d Sess. 23 & 47 (1978); HOUSE REPORT at 1; SENATE REPORT at 1, U.S.Code Cong. & Admin.News, p. 1379; see generally McDannell, 716 F.2d at 1063-66 (providing a detailed history of the Act)); see also 24 AM.JUR.2D Divorce and Separation § 908 (1983 & Supp. 1989) (discussing the Act and cases involving the Act).
The case Henry cited in his brief for support of his contention, McDannell, involves Elizabeth McDannell, who secured a divorce from William McDannell, a (federal) employee of the U.S. Army Corps of Engineers. Pursuant to the divorce decree, Elizabeth was awarded 25% of William's civil service retirement benefits. The decree further ordered William to remit the payments to Elizabeth "through the Registry of the District Court, Office of the District Clerk, Williamson County Courthouse, Georgetown Texas, and that such Clerk remit such payments to [Elizabeth] monthly." 716 F.2d at 1064. Upon his retirement, William (wrongfully) refused to remit the monthly payments as required by the decree. Rather than seek judicial intervention, Elizabeth forwarded a copy of the decree to OPM and requested that her 25% share of William's retirement benefits be sent directly to her. She claimed the right to receive direct payments from OPM under authority of § 8345(j). OPM subsequently notified William of her request and sought permission to comply, but William refused to give his permission.[2] The OPM consequently denied Elizabeth's request. Elizabeth appealed the denial.
The Fifth Circuit Court of Appeals affirmed OPM's decision on the basis that Elizabeth's request (i.e., that OPM remit payment to her directly) was inconsistent with the divorce decree's terms (i.e., that William remit payment to the Clerk of Court). The Fifth Circuit explained that the purpose of the Act (§ 8345(j)) was "to authorize ... OPM to comply with the terms of a state court decree and not to undertake its own determination of spousal entitlements." 716 F.2d at 1066. The Court added:
While sympathetic to the plight of Ms. McDannell and others similarly situated, we cannot say that [OPM's refusal based upon regulation] contravenes congressional purpose... . OPM is entitled to *1115 place the burden on the recipient spouse to obtain a [court] order which is not inconsistent with the form of payment she requests [OPM] to make.
Id. In a footnote, the Court digressed with the following comment:
Indeed, this is not an unreasonable burden to place upon potential recipients of a direct payment from OPM. They need only return to the district court [or chancery court] to obtain an order that conforms to the requirement of OPM's regulations. In the instant case, given [Mr.] McDannell's refusal to perform his fiduciary duty, it should be a simple matter for [Ms. McDannell] to go to the court in [which her divorce decree was devised and request] terminat[ion of Mr. McDannell's] trust rights.
Id. at 1066 n. 1.
Henry's citation of the Act and McDannell does not lead to the conclusion that the award of a lien on his retirement benefits should be struck from the decree. This Court does, however, agree that the divorce decree's phraseology referring to the award of a lien is unclear. This Court is unable to discern, for example: (1) whether the chancellor meant to impose a lien on one-third of Henry's retirement benefits as security in the event Henry fails to meet his financial responsibilities as delineated in the divorce decree; (2) whether the chancellor meant to award Betty one-third of Henry's retirement benefits; or (3) whether the chancellor meant all of the above, some of the above, or none of the above.
McDannell provides insight with which chancellors could learn the means to avoiding the unfortunate circumstances attendant Ms. McDannell's "plight." Restated, in order to avert a potential and probable "McDannell-like" legal quagmire, chancellors should delineate in the divorce decree the specific terms (e.g., method of payment) which concern a former spouse's civil service retirement benefits.
In sum, the chancellor's determination is unclear. This Court therefore remands this particular matter for clarification.

E. Issue Five
Finally, Henry contends that $4,000.00 in attorney's fees is excessive.
Betty's attorney, Mark Prewitt, requested a fee of $100.00 per hour  times (x) fifty-four hours (i.e., $5,400.00). At the hearing, Prewitt presented Travis T. Vance Jr., a Vicksburg attorney who expends most of his professional time dealing with domestic relations cases. Henry's own attorney "accept[ed] him as [a] competent ... attorney in domestic relations matters." During lengthy testimony, Vance explained that he reviewed the case file composed by Prewitt for purposes of trial preparation and other related matters. Vance meticulously detailed the events (e.g., conferences with Betty, devising of petition for divorce, and interrogatories) which transpired between the date Prewitt accepted the case (i.e., January 26, 1988) to the date of the hearing (i.e., September 27, 1988). Vance concluded that fifty-four hours constituted a reasonable amount of time under the facts and circumstances of the case. Moreover, $100.00 constituted a reasonable and customary hourly fee charged by an attorney with Prewitt's expertise. The chancellor, however, awarded only $4,000 (i.e., 40 hours X $100.00 per hour). Betty is not disputing the award; Henry is contending that the award is:
Clearly excessive in that the trial of this cause took one day and one morning... . [I]n no way would 54 hours be required to try and prepare for this case. [And t]his Court is very familiar with attorneys throughout the state ... and the normal rate ... is not $100.00.
Henry failed to substantiate these conclusory statements.
In Holleman v. Holleman, this Court questioned the reasonableness of the attorney's fees because "[t]here was no explanation for the number of hours required, the usual charge in the community, or counsel's preclusion from other employment as a result of taking the present case." 527 So.2d 90, 95 (Miss. 1988). And in McKee v. McKee, this Court opined:
In determining an appropriate amount of attorneys fees, a sum sufficient to *1116 secure one competent attorney is the criterion we are directed... . The fee depends on the consideration of, in addition to the relative financial ability of the parties, the skill and standing of the attorney employed, the nature of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the cause, the time and labor required, the usual and customary charge in the community, and the preclusion of other employment by the attorney due to the acceptance of the case.
418 So.2d 764, 767 (Miss. 1982) (citing Rees v. Rees, 188 Miss. 256, 194 So. 750 (1940)); see also Cheatham v. Cheatham 537 So.2d 435 (Miss. 1988). Based on the evidence adduced at the hearing, the standards espoused in Holleman and McKee were met; Henry presented absolutely no evidence to the contrary.
Like other matters, awarding attorney's fees is entrusted to the chancellor's broad discretion. See Cheatham, 537 So.2d at 440; Holleman, 527 So.2d at 95; Carpenter v. Carpenter, 519 So.2d 891, 895 (Miss. 1988); Dillon v. Dillon, 498 So.2d 328, 331 (Miss. 1986); Kergosien v. Kergosien, 471 So.2d 1206, 1212 (Miss. 1985). "Unless the chancellor abuses his discretion in such matters, his decision [regarding an award of attorney's fees] will generally be upheld." Dillon, 498 So.2d at 331 (citing Ladner v. Ladner, 436 So.2d 1366, 1375 (Miss. 1983)). The chancellor's exercise of sound discretion in the case sub judice is reflected in his scrutinizing of the evidence which led him to reduce the $5,400.00 award requested to $4,000.
In sum, an abuse of discretion is not evident. The award is affirmed.

III. CONCLUSION
The judgment is affirmed  with the exception of the matter concerning the award of a lien on one-third of Henry's retirement benefits, which is remanded for clarification. Finally, Betty's request for additional attorney's fees (assessed for services rendered as a consequence of Henry's appeal) is denied; the $4,000.00 awarded by the chancellor seems quite sufficient to cover the costs of this appeal.
AFFIRMED IN PART, AND REMANDED IN PART FOR CLARIFICATION OF AWARD OF "LIEN ON ONE-THIRD OF RETIREMENT BENEFITS."
ROY NOBLE LEE, C.J., HAWKINS, P.J., and ROBERTSON, SULLIVAN, ANDERSON, PITTMAN and BLASS, JJ., concur.
DAN M. LEE, P.J., dissents.
DAN M. LEE, Presiding Justice, dissenting:
As early as 1971, this Court held:
Any test of the justice of such award must include not only the benefit to the wife but the resultant burden to the husband. Once it is determined, as by our acceptance of the chancellor's finding we have done, that the amount awarded is a sufficient benefit to the wife, there remains the duty of testing the extent of the correlative burden upon the husband. [Aldridge v. Aldridge] 200 Miss. [874] at 878, 27 So.2d [884] at 885 [(Miss. 1946)].
The great disparity which lies in this situation is readily apparent from a comparison of the gross incomes of the parties before and after the alimony payments. When the $1,800 annual alimony payments are deducted from the husband's present gross income and added to that of the wife, the net result is $5,160 for the husband and $7,040 for the wife, or about $1,880 more for the wife. Thus the husband is being forced to contribute such a large percentage of his income to the wife that she has a much greater income and standard of living than his own.
Nichols v. Nichols, 254 So.2d 726 (Miss. 1971).
It is my fear that the principles announced in Nichols, supra, may well have been overlooked by the learned chancellor in this case, particularly when one considers $315 per month car payment has terminated or will terminate shortly.
*1117 Wife (appellee) was awarded $700 per month alimony until the year 2001 (a total of $107,100 from October 10, 1988, to July 2001), the indefinite exclusive use of the marital home and all its contents, with appellant being ordered to repair and maintain the exterior of the home. The award seems to me to be excessive; therefore, I respectfully dissent.
NOTES
[1] As quoted earlier in the text, Henry noted in his brief that  if he is compelled to pay Betty $700.00 each month  a disparity between his and her disposable income will result. According to Betty's calculations of her own expenses, virtually no disparity will result. Henry provided no record cites to substantiate his calculations; Betty did. Moreover, examination of the record reveals that Betty's calculations were not disputed by Henry at the hearing.
[2] Pursuant to a federal regulation, OPM is required to comply with the dictates of a divorce decree. As noted in the text, the decree in William and Elizabeth's case requires William to remit payment to the Clerk of Court who, subsequently, will remit this payment to Elizabeth. Because William refused to remit her share of retirement benefits, Elizabeth requested OPM to remit payment directly to her  as opposed to its continuing to remit payment directly to William. This request was a deviation from the divorce decree; therefore, before OPM could deviate as requested, it was required to seek and receive permission from the other party (i.e., William). See 5 C.F.R. § 831.1703(b).