# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 98-CA-00496-SCT

## CONSOLIDATED WITH

## NO. 97-CA-01193-SCT

*A & L, INC., JLG ENTERPRISES, INC., JLG CONSTRUCTION COMPANY, INC., JLG CONCRETE PRODUCTS CO., INC., GRANTHAM OIL COMPANY , INC., AND JOHN L. GRANTHAM*

*v.*

*LYNN (ROSS) GRANTHAM*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/18/1998 |
| TRIAL JUDGE: | HON. MELVIN McCLURE |
| COURT FROM WHICH APPEALED: | GRENADA COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | T. SWAYZE ALFORD |
| ATTORNEYS FOR APPELLEE: | JAMES T. METZ |
| | JAY GORE, III |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 10/14/1999 |
| MOTION FOR REHEARING FILED: | ; denied 2/10/2000 |
| MANDATE ISSUED: | 2/17/2000 |

**BEFORE PITTMAN, P.J., BANKS AND MILLS, JJ.**

**BANKS, JUSTICE, FOR THE COURT:**

¶1. This marital dissolution case presents issues involving closely held corporations and their role in the determination of the financial issues of equitable distribution and alimony. We conclude that the chancery court committed no manifest error based upon the evidence before it. Accordingly, we affirm.

**I.**

¶2. John L. Grantham (John) and Lynn Ross Grantham (Lynn) were married on January 12, 1985, in Jackson, Mississippi. One child, Raney, was born of this marriage on October 28, 1985. John's son from a previous marriage, Leland, also lived with the parties during their marriage. At the time of the marriage, John was 100 % owner of a corporation known as A & L, Inc. A & L, in turn, owned JLG Enterprises, Inc., JLG Construction Company, Inc., JLG Concrete Products, Inc., and Grantham Oil Company, Inc. John

also owned a one-fourth property interest in the Delta Building. The corporations owned land described as 4 acres of land next to Mid South Produce in Grenada, 21 acres near Newsprint South, and 280 acres of timber land. At the time of separation, the corporations' ongoing businesses and assets consisted mainly of real estate holdings and bank accounts.

¶3. Lynn, who worked for the Unitech company in Jackson, Mississippi, was earning $40,000 per year at the time of her marriage to John. After her marriage, Lynn quit her job and the couple moved to Grenada, Mississippi. Before moving to Grenada, Lynn sold her Jackson condominium and her 1983 Maxima. Half the proceeds from sale of the condominium went to Lynn's mother, who was joint owner, while Lynn's share of the sale was used on daily living expenses for her and John.

¶4. From the beginning of the marriage, Lynn received a regular paycheck of about $250 per week from the corporate accounts to run the household, although she was not employed by any of the corporations. This amount increased to $500, which she continued to receive when she began working for the companies in 1990. After 1990, the amount given to Lynn remained the same. Instead of increasing the paycheck, she was instructed by John to take money out of the corporate accounts as needed. At this time, John was also working for Hayes Construction in Natchez.

¶5. After the marriage, the couple moved into a Grenada home owned by John, which was sold shortly after the marriage for $ 84,349.82 when John and Lynn decided to build a new home. The lot for the new home, 30 Forest Hill Cove, was purchased for $35,000 in December of 1986 by JLG Construction.

¶6. After the parties were married, John received $428,999.41 in settlement proceeds from a lawsuit filed before the marriage by a corporation John owned prior to the marriage. The monies from this settlement were deposited into an account held by JLG, Inc. and were used in part to pay for construction of their new home.

¶7. During the course of the marriage, the couple also routinely paid personal living expenses out of various corporate accounts, including alimony payments to John's first wife. For income tax purposes, the funds used for personal expenses were reflected as loans to shareholders. The parties signed a promissory note in favor of JLG Construction on April 1, 1988, but the amount to be repaid was not disclosed in the promissory note.

¶8. At some point during the marriage, John issued 10% of the stock in the companies to Lynn. The stock certificate, however, was returned to the parties' safe at a date unknown, purportedly signed by Lynn, returning the stock to the corporations.

¶9. Lynn withdrew $45,000 in corporate funds on October 7, 1993 and deposited the money into her own account. On October 15,1993, Lynn and John separated. Lynn then filed for divorce on October 29, 1993, on the grounds of habitual drunkenness, or, in the alternative habitual cruel and inhuman treatment, or in the alternative, on the grounds of irreconcilable differences. John counterclaimed for divorce on the grounds of habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences and for partition of the jointly owned property.

¶10. On November 9, 1993, John sold all of his stock in A & L, Inc, which owned all the corporations, to his brother and sister, Robert Grantham and Elizabeth Sanders. The buy-sell agreement required the sellers to pay $10,000 within ninety days and to pay the fair market value of the property owned by the

corporations as of November 9, 1993, which was contingent on liabilities and market value appraisals. Under new ownership, A & L, Inc. filed a replevin action against Lynn on February 1, 1994. Lynn filed a complaint against John and the corporate entities on March 29, 1994. These cases were consolidated for discovery and trial purposes.

¶11. John and Lynn filed a written stipulation stating their agreement that they had irreconcilable differences, that Lynn would have custody of Raney, and that John could have visitation pending further order of the court. The remaining matters of child support, visitation, alimony, property division, attorney's fees and costs were submitted to the court for determination.

¶12. After hearing testimony for six days over a sixteen month span, the chancellor entered an opinion setting aside the conveyance to Robert Grantham and Elizabeth Sanders as fraudulent, piercing the corporate veil, and finding all assets of both parties were available for equitable distribution. The following were found to be marital assets:

| Former marital residence | $ 225,000.00 |
|---|---|
| Furnishings, fixtures, and appliances of residenc | 1,500.00 |
| Plaintiff's jewelry & gifts from defendant's aunt and uncle | 10,000.00 |
| Four automobiles and lawn mower | 14,000.00 |
| 4 acres by Mid South Produce | 148,000.00 |
| 280 acres timber land | 113,000.00 |
| 21 acres by Newsprint South | 83,500.00 |
| Corporate cash in banks | 6,820.00 |

| | |
|---|---|
| Grenada Bank Stock-sold net | 37,601.00 |
| Depreciable Assets-sold net | 59,612.00 |
| LESS: Expenses of JLG & Grantham Oil | (80,790.00) |
| Plaintiff's IRA's | 19,639.00 |
| Defendant's IRA's | 36,724.00 |
| One share of Grenada Country Club | 500.00 |
| Defendant's cash & savings at Magnolia Federal | 3,000.00 |
| Delta Building 1/4 interest | 40,000.00 |
| Sums Plaintiff Withdrew at separation | 47,000.00 |
| Total | $805,106.00 |

¶13. The court found that the value of the various corporations was marital property, based in part on the fact that $1,200,000 in debt John had when the parties married amounted to only $44,000 at the time of separation. The court found that the parties had in fact accumulated assets during the marriage. Lynn was awarded 40% of the marital assets, with John receiving the remaining 60%. Lynn's award included:

| | |
|---|---|
| Former marital residence | $225,000.00 |
| Furnishings, fixtures and appliances of residence | 1,500.00 |
| Plaintiff's jewelry and gifts from John's aunt and uncle | 10,000.00 |
| Plaintiff's Mercedes, pick-up and lawn mower | 14,000.00 |
| Plaintiff's IRA's | 19,639.00 |
| Sums Plaintiff withdrew at separation | 47,000.00 |
| Cash equitable distribution from Defendant | 4,903.00 |
| | $322,042.00 |

¶14. John was awarded the rest of the marital assets, including all of the corporations. Lynn was also assessed 80% of any tax liability imposed upon the parties for their use of accounts as loans to shareholders. The disparate assessment of tax liability was termed as lump sum alimony. As part of this lump sum award, Lynn was also released from any liability to John or any of his corporations for sums shown as loans to stockholders.

¶15. The Judgment for Divorce was entered on June 10, 1997. John subsequently filed a Motion for New Trial, or in the Alternative, to Alter or Amend Final Judgment, which the court denied. Aggrieved, John appealed to this Court for relief. Subsequent to the original judgment the chancellor heard the issue of Lynn's request for attorneys fees arising out of the fraudulent transfer of corporate stock. John appeals the judgment in Lynn's favor and that appeal has been consolidated with the initial appeal.

## II.

¶16. John argues that the chancellor erred in including his separate property in the distribution of martial assets. John asserts that the ownership interest he possessed in various corporations and property before his marriage, as well as the land owned by the corporate entities, were not marital assets. He further argues that the proceeds from the sale of the home he owned prior to the marriage were separate property. He

contends that the funds used to construct the couple's new home came from his various separate assets, which included the corporations, the proceeds from the sale of his home and the proceeds from settlement of a lawsuit by one of his companies.

¶17. The chancellor held, as Lynn asserts, that there was such a commingling of John's separate assets that the non-marital assets converted to marital assets, subject to equitable distribution.

¶18. This Court's review in domestic relations matters is limited such that the Court will not disturb a chancellor's findings unless manifestly wrong, clearly erroneous, or if the chancellor applied the wrong legal standard. *Johnson v. Johnson*, 650 So. 2d 1281, 1285 (Miss. 1994)(citing *McEwen v. McEwen*, 631 So. 2d 821, 823 (Miss. 1994). Marital property is defined as any and all property acquired during the marriage. *Hemsley v. Hemsley*, 639 So. 2d 909, 915 (Miss. 1994). Assets so acquired or accumulated during the course of the marriage are marital assets and are subject to equitable distribution by the chancellor. *Hemsley*, 639 So. 2d at 915. However, non-marital assets may be converted into marital assets if they are commingled with marital assets or used for familial purposes, absent an agreement to the contrary. *Heigle v. Heigle* 654 So. 2d 895, 897 (Miss. 1995); *Johnson v. Johnson*, 650 So. 2d at 1286. Commingled property is a combination of marital and non-marital property which loses its status as non-marital property as a result. *Maslowski v. Maslowski*, 655 So. 2d 18, 20 (Miss. 1995).

**A**.

¶19. We address each of the assets which John argues is separate property. John first asserts that because Lynn made no contribution to the acquisition of the corporate entities or property owned by the corporations before he married her, those assets were not marital assets. He contends that he bought most of his ownership in the corporate interests, including Grantham Oil Company and JLG Concrete, from his ex-wife's father before his marriage to Lynn. John claims that with the purchase of these companies came ownership of properties owned by these companies, four acres by Mid South Produce and twenty-one acres near Newsprint South. John's company, A & L, Inc., was owner of JLG Construction and JLG Enterprises in addition to Grantham Oil and JLG Concrete. He further asserts that settlement funds received from a lawsuit filed by one of the companies owned prior to his marriage, in the amount of $428,999.40, also constitute a separate assets which were not subject to equitable distribution.

¶20. The chancellor found that John's interests in the corporations and the properties owned by the corporation had been commingled such that these assets had become marital assets subject to equitable distribution.

¶21. Throughout the marriage, John and Lynn used corporate funds from accounts of the companies to pay for personal expenses, documenting the monies as loans to shareholders instead of income. Often times, the funds used for personal expenses were deposited directly into Lynn and John's joint checking account. In addition, the monies from the settlement, deposited into the account of JLG Enterprises for payment of a loan previously made to the settling corporation, were used to construct a new home for the couple and pay various other household and personal expenses, including private school tuition for Raney and Leland.

¶22. Corporate income was co-mingled with marital income and thereby became marital assets. *Tillman v. Tillman*, 716 So. 2d 1090, 1093-94 (Miss. 1998). Clearly the corporations were simply alter egos of John, and the chancellor justifiably pierced the corporate veil. While this does not necessarily co-mingle the corporations themselves or all of their assets such that the principal, as opposed to the income used

becomes a marital asset, the evidence before the court in this case made it difficult to draw a precise line of demarcation.

¶23. The burden is upon one claiming assets to be non-marital to demonstrate to the court their non-marital character. *Hemsley*, 639 So. 2d at 915. This burden goes beyond a mere demonstration that the asset was acquired prior to marriage. Where, as here, there is a suggestion that the net equity in the assets may have increased due to the spouse/owner's efforts, as opposed to enhanced value passively acquired, there must be a showing such as would allow the chancellor to separate the former, a marital asset, from the latter, a non-marital asset. *See also Oxley v. Oxley*, 695 So. 2d 364 (Fla. Dist. Ct. App. 1997).

¶24. The evidence before the court in the instant case suggests that there was a substantial increase in value of the net assets of the corporations due at least in part to John's managerial efforts. That increase in value, like John's other earnings, is considered a marital asset. The record does not permit a precise calculation of that value. Nevertheless the chancellor's rough estimate, based upon the diminution of debt from more than $1 million to less than $50,000, is sufficient for present purposes. This is especially so in the absence of more complete proof from John as to the value of his various enterprises at the time of the marriage and at the time of separation and how those values came to change. While John sought to explain the diminution of debt by reference to the sale of assets, he offered no proof of the sale price of any particular asset.

¶25. The chancellor, correctly in this case, considered the corporate assets in arriving at an equitable distribution. Nevertheless, no corporate assets were distributed to Lynn save forgiveness of supposed debt owed to the corporation for "loans" made to Lynn and John for living expenses. This debt forgiveness was considered lump sum alimony. The question whether lump sum money was appropriate will be considered later. Leaving aside for the moment the decision to pierce the corporate veil, it should suffice to say that the chancellor's decree considering John corporate assets as marital property is not manifestly erroneous.

## B.

¶26. John argues that the proceeds from the sale of his Dove Loop home were separate property because he owned the home prior to his marriage to Lynn. However, the proceeds, totaling $84,349.00, were used by John to support his family and for construction of a new home for the couple. This commingling of assets converted the proceeds into marital assets, which the chancellor properly found to be subject to distribution.

## C.

¶27. John next asserts that the home at Forest Hill Cove should not have been included as marital property because funds used to construct the home were derived from his separate assets. The lot for the home was purchased by JLG Construction in December 1986. The property was later transferred from the corporation's name to that of John and Lynn as joint tenants in April 1988. The couple maintained this home as their marital residence from around December 1987 until the time of separation. The record suggests that John applied proceeds from the sale of the Dove Loop home, the lawsuit settlement, as well corporate funds to construction of the Forest Hill Cove residence.

¶28. Clearly, the Forest Hill Cove residence is a result of funds which were at best co-mingled, even if the funds were not derived as a result in part of John's managerial efforts with respect to corporate revenue.

¶29. John further argues that based on his contributions financially, he is entitled to a more equitable distribution of the home. It is within chancellor's authority to make an equitable distribution of all marital

property. ***Ferguson v. Ferguson***, 639 So. 2d 921, 928-29 (Miss. 1994). This Court has for several years recognized that in making equitable divisions of marital property upon divorce, chancellors are not limited to considering only the earning and cash contributions of each party to the accumulation of the property, but rather "[it] is sufficient contribution if one party renders services generally regarded as domestic in nature." [*MacDonald v. MacDonald*, 698 So. 2d 1079, 1083 (Miss. 1997)](quoting ***Draper v. Draper***, 627 So. 2d 302, 306 (Miss. 1993).

¶30. The chancellor noted that both parties contributed to the accumulation of the martial assets, which included the Forest Hill Cove home, with John contributing directly and Lynn indirectly. The chancellor further noted that Lynn had worked for John's companies, while raising their children and supporting John in both family and business matters. Contrary to John's argument, the distribution by the chancellor did take into account John's financial contributions to the construction of the home. Although Lynn's contributions were more domestic in nature than financial, her contribution cannot be disregarded. In light of this fact, the chancellor's findings will not be disturbed by this Court.

### D.

¶31. John further claims that interest in the Delta Building property which John obtained before the marriage is also a separate asset. Lynn argues that, although the interest originated before the marriage, John was able to increase his interest in the building during their marriage from 20% to 25% after buying-out another shareholder.

¶32. John first obtained an interest in the Delta Building in 1983, but receives no income from ownership. John acquired the higher ownership interest during the course of his marriage to Lynn. In determining the marital assets, the chancellor noted that it was not proven by John that the assets claimed to be separate were not in fact marital. Under ***Hemsley***, assets acquired or accumulated during the course of the marriage are subject to equitable distribution unless it can be shown by proof that such assets are attributable to one of the parties' separate assets prior to or outside the marriage. It was not shown here that the funds used to increase the percentage of ownership came from John's separate assets. The additional interest in the Delta Building was acquired during the marriage, and as such, at least one-fifth of the 25% interest in the Delta Building was a martial asset subject to equitable distribution.

¶33. Moreover, although the entire interest in Delta Building was included in the distribution, John retained sole ownership of that interest after equitable distribution. In light of the distribution of specific assets in their entirety and the ability of the chancellor to consider both marital and non-marital assets where necessary to arrive at an equitable distribution, the failure to separate the portion of the building which was acquired prior to the marriage is insufficient to upset the chancellor's equitable division.

### III.

¶34. John asserts the chancellor erred in awarding Lynn lump sum alimony in the amount of 80% of the potential income tax liability and releasing her from any liability to him or any of the corporations for sums shown as loans to shareholders. Lynn argues that the chancellor was correct in making such an award because John caused the tax problem by instructing her to record their personal living expenses as loans to shareholders.

¶35. While John contests the chancellor's decision as to the lump sum award, he cites no authority in

support of his argument to the Court. This Court has set forth factors which the chancellor must consider in awarding lump sum alimony. Those factors to be considered include: 1) substantial contribution to the accumulation of total wealth of the payor either by quitting a job to become a housewife, or by assisting in the spouse's business; 2) a long marriage; 3) where recipient spouse has no separate income or the separate income is meager by comparison; 4) without the lump sum award the receiving spouse would lack any financial security. *Tilley v. Tilley*, 610 So. 2d 348, 352 (Miss. 1992).

¶36. We conclude that there was no manifest error in the chancellor's conclusion that Lynn met the factors necessary for lump sum alimony to be awarded. She quit a lucrative job and moved to Grenada to support John's business ventures. She stayed home to raise their child as well as John's son from a previous marriage. Lynn also eventually started working for the corporations, doing clerical and bookkeeping work. Their marriage lasted twelve years. At the time of trial, Lynn was in nursing school and projected her income upon passing her boards to be about $26,000 per year. She also has a Bachelor of Arts degree in sociology. Before completion of the trial, Lynn became qualified as a Registered Nurse, earning $21 per patient she sees as a contract nurse. Lynn also earns $75 per month for payroll work at a small business.

¶37. The chancellor found John's monthly salary to be $4,378.46, substantially more than Lynn's monthly income of about $2,411.36. John contests this finding based on a W-2 statement from his employer. Lynn points to testimony in the record contrary to John's contention and to the fact that none of this deals with income from the corporations that John claims to have sold and out of which he had lived in the past in the form of "loans to stockholders." Moreover, even if John's income is reduced, the polestar consideration is a comparison of the estates, and the distribution remains equitable even where John has income comparable to Lynn's. *Brennan v. Brennan*, 638 So. 2d 1320, 1324 (Miss. 1994). The chancellor noted that if not for the potential tax liability problem, each party would have relative financial security after equitable distribution. Considering the factors in *Tilley* with the foregoing facts, the chancellor was not manifestly in error in awarding lump sum alimony to Lynn.

¶38. The chancellor noted that because the potential tax problem was caused by his using corporate funds to pay the family's personal living expenses, including construction of the family's home, John should pay 80% of any amount of tax liability. The lump sum award also included Lynn's release from any and all liability to John or the corporations for sums shown as loans to shareholders. John argues that Lynn benefitted from the loans and cannot now try to disclaim accountability.

¶39. John instructed his accountant to show the funds as loans to shareholders in an effort to avoid or at least defer paying taxes on the money. Lynn was instructed by the company accountant and John to document funds she used to run the household and for personal expenses as loans. During the later years of their marriage, Lynn became aware that the loans would have to be repaid. She requested that a schedule be set up, although no payments were made. Based on the record, the chancellor was not manifestly wrong in concluding that John controlled the use of the funds as loans to shareholders, which resulted in a potential tax liability problem.

¶40. In light of the estates of the parties, John is also in a better position financially to incur a larger portion of any tax problems that may arise. After the equitable distribution, Lynn possessed assets valued at $322,042.00, more than two-thirds of which is the marital residence, while the total assets left with John amounted to about $433,064. The amount of alimony awarded is a matter primarily within the discretion of the chancery court because of "its peculiar opportunity to sense the equities of the situation before it." *Tilley*

*v. Tilley*, 610 So. 2d at 351.

¶41. Finally, liability that we consider here is potential. It may or may not come to fruition, and the amount is uncertain. As the person in control of the corporate taxpayer, John will to a large extent influence the outcome of this tax issue.

¶42. The lump sum award in the form of release from the potential tax is affirmed.

## IV.

¶43. John raises the issue of whether the chancellor committed manifest error by rejecting the property values offered by John's expert. During the trial, all the attorneys for the various parties agreed that the appraisals should be submitted by stipulation. The attorney for the corporations also stated that there was no objection to the court's considering the appraisals "for whatever weight they put on each of the appraisals at the time they were done." In *Sandlin v. Sandlin*, 699 So. 2d 1198, 1205 (Miss. 1997), the parties submitted affidavits to establish the value of marital property; on appeal the husband claimed that the chancellor erred in relying on the un-rebutted, un-crossed affidavits. This Court held that "because both parties made a 'knowing and intelligent' waiver of their respective rights to cross examination, allowing the chancellor to rely upon their affidavits in reaching his decision, we find that this issue is without merit." *Id.* at 1205.

¶44. Also, a chancellor is justified in rejecting the values an appraiser places on assets where there is reason to doubt the trustworthiness of the appraisal. *Carrow v. Carrow*, 642 So. 2d 901, 907 (Miss. 1994). There was testimony that various assets were not included in the appraisal submitted by John. Additionally, the chancellor was in a position to assess the report including the basis for the various estimates and determine which appeared the more logical and persuasive. The chancellor did not abuse his discretion in valuing the marital property.

## V.

¶45. John raises the issue of whether the chancellor committed manifest error by awarding Lynn funds she withdrew from the corporate account. As discussed *supra*, the chancellor correctly held that the corporation was an alter ego of John and that the corporate assets had been commingled with the marital assets. As such, the assets of the corporation, including the funds withdrawn by Lynn, were subject to equitable distribution.

¶46. In determining the equitable distribution the chancellor considered the guidelines set out in *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994). The money Lynn withdrew from the corporate account was credited against her distributive share of the marital assets. It follows that the chancellor was well within his discretion to allow Lynn to retain the funds.

## VI.

¶47. John raises the issues of whether the chancellor erred by setting aside the conveyance of all of the corporate stock in A & L, Inc., by piercing the corporate veil, and finding that the corporate assets were available for equitable distribution. Each of these issues is addressed separately below.

### A. Fraudulent Conveyance

¶48. John claims that the trial court erred in setting aside the conveyance of the corporate stock in A & L, Inc., as a fraudulent conveyance. In a divorce action a chancellor is justified in setting aside, as fraudulent, a conveyance made by one of the spouses, where the conveyance was made with the exclusive intent of cheating the other spouse out of their share of marital assets. *See* ***Morreale v. Morreale***, 646 So. 2d 1264, 1267 (Miss. 1994); ***McNeil v. McNeil***, 607 So. 2d 1192, 1195 (Miss. 1992). *See also* ***Blount v. Blount***, 231 Miss. 398, 413-14, 95 So. 2d 545, 552 (1957) (holding that "[a] wife, in respect of her right to maintenance or alimony, is within the protection of statutes or the rule avoiding conveyances or transfers in fraud of creditors..."). In order to determine whether the conveyance was made with a fraudulent intent the trial court should analyze the circumstances surrounding the conveyance for the presence of "badges of fraud." ***Morreale***, 646 So. 2d at 1268; ***McNeil***, 607 So. 2d at 1195. The badges of fraud, as set out in ***Reed v. Lavecchia***, 187 Miss. 413, 424-25, 193 So. 439, 441 (1940), include:

> Inadequacy of consideration, transaction not in usual course or mode of doing business, absolute conveyance as security, secrecy, insolvency of grantor, transfer of all his property, attempt to give evidence of fairness ..., retention of possession, failure to take a list of the property covered by the conveyance ..., relationship of the parties, and transfer to person having no apparent use for the property.

¶49. After Lynn filed the Complaint for Divorce, John sold all of his stock in the corporations to his brother and sister. The purchase price consisted of $10,000 and a value to be determined at a later date contingent upon the outcome of, among other things, the divorce proceedings and an agreement to forgive John's indebtedness to the corporations for the "loans to stockholders." The transfer left John possessed of little more than his personal effects, a vehicle upon which there was a sizeable lien, and his one-quarter interest in the Delta Building.

¶50. The chancellor noted that neither John's brother nor his sister live in the Grenada area or have any apparent use for the property. Nor had they had previous business connections to the corporations. The chancellor also found that the parties to the sale of the corporations failed to provide a sufficient list of the assets conveyed and their values. The conclusion that this was a fraudulent transfer is not manifestly erroneous and will not be disturbed.

### B. Piercing the Corporate Veil

¶51. "[A] corporation is a legal entity separate and distinct from its shareholders." ***Skinner v. Skinner***, 509 So. 2d 867, 870 (Miss. 1987). However, the corporate entity may be disregarded where "the separate personalities of the corporation and the shareholder no longer exist and adherence to the fiction of separate corporate existence would under the circumstances sanction a fraud or promote injustice. . . ." ***T.C.L., Inc. v. Lacoste***, 431 So. 2d 918, 922 (Miss. 1983), *overruled on other grounds*, ***C & C Trucking Co. v. Smith***, 612 So. 2d 1092 (Miss. 1992).

> The rationale used by courts in permitting the corporate veil to be pierced is that if a principal shareholder or owner conducts his private and corporate business on an interchangeable or joint basis as if they were one, he is without standing to complain when an injured party does the same. ***Bone Constr. Co. v. Lewis***, 148 Ga. App. 61, 250 S.E.2d 851, 853 (1978). In ***Lyons v. Lyons***, 340 So. 2d 450, 451 (Ala. Civ. App. 1976), the court stated that "[a] court of equity looks through form to substance and has often disregarded the corporate form when it was fiction in fact and deed and was merely serving the personal use and convenience of the owner."

*Colman v. Colman*, 743 P.2d 782, 786 (Utah Ct. App. 1987).

¶52. Here the trial court found that the corporation was John's alter ego. The facts supportive of that finding have been recited herein above. It should suffice to say that, at least for purposes of the dissolution of this marital estate, the conclusion of the chancellor is amply supported by the record.

## VII.

¶53. The chancellor denied Lynn's motion for attorneys' fees incurred in obtaining the divorce, but granted her motion for attorneys' fees incurred in setting aside the fraudulent conveyance. The chancellor found that, although the hourly rates charged were reasonable, only 45% of the fees claimed were related to setting aside the fraudulent conveyances. As a result, Lynn was awarded $12,175.65 out of the $27,057.00 claimed. The chancellor further found that because John had acted with an intent to frustrate the equitable distribution of marital property, it would be unjust to require Lynn to pay the attorneys' fees incurred in setting aside the fraudulent conveyance.

¶54. John asserts that the chancellor erred in awarding Lynn attorney's fees associated with setting aside the fraudulent conveyance. However, John spends the majority of his brief rearguing the propriety of the chancellor's ruling that the conveyance was fraudulent and that the business assets were subject to equitable distribution. John claims, by way of conclusory statements, that the chancellor cited no authority in determining that Lynn was entitled to attorney's fees and that the fees awarded were excessive. John states that attorney's fees were not allowed in any of the cases cited by the chancellor in finding that the transfers were fraudulent. *See **Morreale v. Morreale***, 646 So.2d 1264 (Miss. 1994); ***Southeast Bank of Broward, Florida N.A. v. I.P. Sarullo Enters., Inc.***, 555 So. 2d 704 (Miss. 1989); ***Blount v. Blount***, 236 Miss. 398, 95 So. 2d 545 (1957); ***Reed v. Lavecchia***, 187 Miss. 413, 193 So. 439 (1940) . Contrary to his assertion, these cases do lend support to the chancellor.

¶55. The lower court in ***Blount***, after finding that the transfer from the husband to his father was fraudulent, ordered the husband to pay his wife's attorney's fees. ***Blount***, 236 Miss. at 409-10, 95 So. 2d at 550. The issue of attorney's fees was not raised on appeal, and the judgment of the lower court was affirmed without a discussion as to whether an award of attorney's fees was warranted. ***Id.*** at 551, 563. In ***Reed***, the parties did not raise, nor did the Court address the issue of whether attorneys' fees were warranted. In ***Southeast Bank***, it was held that the chancellor did not err in refusing to award attorney's fees in connection with a fraudulent conveyance, *especially in light of the fact that the party had previously been awarded attorney's fees*. ***Southeast Bank***, 555 So. 2d at 712. And in ***Morreale***, this Court reversed the lower court's finding that the wife was not entitled to attorney's fees. ***Morreale***, 646 So. 2d at 1271.

¶56. In divorce matters the allowance of attorney's fees is left to the sound discretion of the chancellor. ***Doe v. Doe***, 644 So. 2d 1199, 1208 (Miss. 1994). However, the chancellor's discretion is not unlimited. The chancellor generally must determine that the fees claimed are reasonable and are for necessary services rendered and that the party requesting attorney's fees can not afford to pay the fees. ***Id.***

¶57. John claims that the fees awarded were excessive. A chancellor's determination regarding the award of attorney's fees will not be disturbed on appeal absent a finding of manifest error. ***Boykin v. Boykin***, 565 So. 2d 1109, 1115 (Miss. 1990); ***Grice v. Grice***, 726 So. 2d 1242, 1255 (Miss. Ct. App. 1998). The factors to be considered in determining the reasonableness of attorney's fees include:

... the skill and standing of the attorney employed, the nature of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the cause, the time and labor required, the usual and customary charge in the community, and the preclusion of other employment by the attorney due to the acceptance of the case.

*McKee v. McKee*, 418 So. 2d 764, 767 (Miss. 1982).

¶58. Here, the chancellor stated that he reviewed the bill submitted and found the hourly rates to be reasonable in light of the type of work, its nature and difficulty. The chancellor found that although the fees charged were reasonable, only 45% of the work claimed was attributable to setting aside the fraudulent conveyance. The chancellor separated out those costs relating to the divorce action and ruled that Lynn was only entitled to those costs allocable to setting aside the fraudulent conveyance, a ruling which John acknowledges.

¶59. John claims the fees awarded clearly exceed the fees related to setting aside the conveyance. This assertion is not supported by the record. The bill reviewed by the chancellor is not included in the record on appeal. Nor, are we aided by the transcript of any proceedings on the matter below. It is incumbent upon John to present record evidence by which this Court can determine the propriety of the chancellor's actions; conclusory statements are not sufficient. *Boykin*, 565 So. 2d at 1115-16. Thus, it can not be said that the chancellor committed manifest error in determining the amount of attorney's fees to be awarded Lynn.

¶60. It is within the chancellor's discretion to award attorneys fees, in a divorce action, in spite of a spouse's ability to pay, where additional attorney's fees are incurred as a result of the opposing spouse's fraudulent conveyance of marital property. The chancellor has the discretion to excuse the general requirement that the party requesting attorney's fees be unable to pay. *Anderson v. Anderson*, 692 So. 2d 65, 73 (Miss. 1997). As this Court noted in *Pittman v. Pittman*, 652 So. 2d 1105, 1111-12 (Miss. 1995), awarding attorney's fees under these circumstances, regardless of the party's ability to pay, is not a reward, but reimbursement for the extra legal costs incurred as a result of the opposing party's fraudulent actions.

¶61. John further argues that the chancellor erred by failing to cite to any authority in his findings of facts and conclusions of law. Contrary to John's argument, the chancellor's failure to cite to relevant legal authority does not necessarily constitute reversible error. *Selman v. Selman*, 722 So. 2d 547, 554 (Miss. 1998). Reversal is warranted only where the failure to make sufficient findings of fact and conclusions of law constitutes manifest error. *Id.* As discussed above, the chancellor correctly determined the reasonableness of the fees claimed, what portion of the fees related to setting aside the fraudulent conveyance and appropriately determined that Lynn should not have to pay to undo John's fraudulent act. This assignment of error is without merit.

## VIII.

¶62. For these reasons, the judgments of the Grenada County Chancery Court are affirmed.

¶63. **AFFIRMED.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., SMITH, MILLS, WALLER AND COBB, JJ., CONCUR. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION.**

## McRAE, JUSTICE, DISSENTING:

¶64. While I see no error in the chancellor's and this Court's distribution of the house and other properties, I disagree with the distribution of assets from the corporations belonging to John Grantham. John's ownership in the corporations A&L, Inc., and Delta Building predated his marriage to Lynn and should not be considered marital assets. However, given that the majority affirms the treatment of the corporations owned, in whole or in part,[(1)] by John as marital assets, I also disagree with assigning to John 80% of any tax liability for use of accounts as loans to stockholders.

¶65. Marital property is defined as any and all property acquired or accumulated during the marriage. *Tillman v. Tillman*, 716 So.2d 1090, 1093 (Miss. 1998). While separate property may lose its separate identity where it is used for family purposes or commingled with marital assets, *Traxler v. Traxler*, 730 So.2d 1098, 1103 (Miss. 1998); *Heigle v. Heigle*, 654 So.2d 895, 897 (Miss.1995), where the assets of a corporation are commingled with marital property, this alone does not justify piercing the corporate veil.

¶66. A corporation is treated as a separate entity and its assets are to be treated as separate and distinct from the debts of its individual shareholders. *American Telephone & Telegraph Co. v. Purcell Co.*, 606 So.2d 93, 97 (Miss. 1990). The mere operation of corporate business does not render one personally liable for corporate acts. Sole ownership of a corporation by one person is not a factor; nor is the fact that the sole owner uses and controls it to promote his ends. *Gray v. Edgewater Landing*, 541 So.2d 1044, 1047 (Miss. 1989).

¶67. In *Gray v. Edgewater Landing, Inc*., this Court held that in order to pierce the veil of a corporation, a plaintiff must show the following: (1) a frustration of the legitimate expectations of the plaintiff regarding the entity to whom he looked for contract performance; (2) a flagrant disregard for the corporate formalities by the principals of the corporation and; (3) fraud or equivalent malfeasance by the corporate principals. *Gray,* 541 So.2d at 1047. The proof in this case falls short of that needed to pierce the corporate veil.

¶68. In *Ward v. Ward*, 659 S.W.2d 605 (Mo.App. 1983), the Missouri Court of Appeals held that the trial court erred when it treated corporate assets owned by the husband as marital assets. "A marital dissolution decree may not purport to affect property of a corporation that is not a party to the litigation, even if the corporate stock is primarily owned by one of the parties to the dissolution action." *Ward*, 659 S.W.2d at 607. "The trial court is limited," the *Ward* court wrote, "to a disposition of the stock of the corporation which was admitted by both parties to be marital property." *Id.*

¶69. While there are circumstances which justify ignoring the corporate entity, those circumstances do not exist here. For example, in *Lyons v. Lyons*, 340 So.2d 450 (Alab.App. 1976), the wife owned one share of stock and the husband the remainder in a closed corporation through which the husband conducted a home improvement business. The proof showed that there were no corporate meetings or records, the corporation had never filed an income tax return, the husband was not paid a salary from the corporation but intermingled the corporate funds with those of his own. This evidence was sufficient, the court held, to justify disregarding the corporate form and conveying real property owned by the corporation to the wife as part of the property settlement.

¶70. While the evidence here shows that corporate funds were commingled with the personal finances of

the parties, there is no evidence that there was a "flagrant disregard for the corporate formalities". Indeed, there was evidence by the corporation's accountant that the corporation filed a separate tax return each year. Given that John Grantham owned the corporation prior to his marriage to Lynn coupled with the fact that the evidence falls short of that which is needed to pierce the corporate veil, the majority is wrong to ignore the separate status of the corporations owned in whole or in part by John Grantham and to treat the corporations' assets as marital assets.

¶71. Using a divorce court to intervene in the operations of a corporation should be done reluctantly if at all. The evidence in this case is insufficient to justify the chancery court's intervention in the operation of a business corporation in a divorce proceeding, all in the name of equitable distribution.

¶72. However, the majority having decided to treat the corporate assets as marital ones and to divide them accordingly, it is wholly inequitable to assign John 80% of any tax liability arising from the operation of the corporations. I disagree with that part of the majority opinion as well.

¶73. Finally, on the matter of attorneys fees. Lynn's attorney charged $100 an hour and billed a total of $27,057.00 for his work on setting aside the stock transfers. The chancellor awarded a fee equaling 45% of this amount - $12,175.65. This Court, citing the various factors to be used in determining the reasonableness of attorneys fees,[2] affirms the award. While I do not have any quarrel with the factors used in awarding attorneys fees, I cannot help but point out the continuing inconsistency in this Court's treatment of attorney fees in civil versus criminal cases - especially death penalty cases. On September 23, 1999, this Court issued an administrative order, No. 1999 AD 00001, advising trial courts to continue to look to *Wilson v. State*, 574 So.2d 1338 (Miss. 1990), for guidance in attorney fee awards in capital cases. *Wilson* allows $1,000 "profit" in addition to $25.00 an hour in expenses.[3] I, for one, cannot countenance the miserliness with which attorney fees are "awarded" in capital cases. Attorneys defending persons charged with capital murder perform one of the toughest jobs an attorney can face. They should be compensated, at the very least, adequately.

¶74. For all of these reasons, I dissent.

1. While John owned 100% of A&L, Inc., he was only a 25% owner in Delta Building.

2. Those factors include the skill and standing of the attorney employed, the nature of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the cause, the time and labor required, the usual and customary charge in the community, and the preclusion of other employment by the attorney due to the acceptance of the case. *McKee v. McKee*, 418 So.2d 764, 767 (Miss.1982).

3. *Wilson* establishes $25.00 per hour as a rebuttable presumption for expenses. An attorney who can prove that his expenses are greater than $25.00 per hour may be entitled to more. *Wilson*, 574 So.2d at 1341.